DONALD GIGER ET AL., APPELLANTS, V. CITY OF OMAHA, A MUNICIPAL CORPORATION, ET AL., APPELLEES.
D. JAMES WITHERSPOON ET AL., APPELLANTS, V. CITY OF OMAHA, A MUNICIPAL CORPORATION, ET AL., APPELLEES.

442 N.W.2d 182

Filed June 30, 1989.   No. 87-521.

677

John C. Mitchell, of Mitchell & Demerath, and J. Patrick Green for appellants Giger et al.

Richard E. Croker, of Croker, Huck & McReynolds, P.C., and Larry W. Myers for appellants Witherspoon et al.

Charles K. Bunger, Assistant Omaha City Attorney, and Frank F. Pospishil and Harvey B. Cooper, of Abrahams, Kaslow & Cassman, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This appeal involves two lawsuits relating to a development known as One Pacific Place. The development is being constructed on an 84-acre tract of land formerly owned by Carl Renstrom located in southwest Omaha. The land, hereafter the Renstrom property, is approximately triangular in shape, bordered on the north by Pacific Street, on the east by the Happy Hollow and Sunset Hills residential developments, on the southwest by the Big Papillion Creek, and on the west by 105th Street.

In March 1983, appellee Midlands Development Company (Midlands) entered into a real estate purchase agreement with the Renstrom estate for the purchase of the property. Midlands then applied to the city to have the Renstrom property rezoned to permit the construction of a mixed-use development consisting of retail, office, and residential buildings. As part of the application process, Midlands submitted several development plans. A final plan was developed which indicated the following uses for 48 acres of the tract: 112,000 square feet of retail space, 390,000 square feet of office space, 558,000 square feet of parking space, 300 residential units, a private lake, and a planned unit development (PUD). The plan also called for the construction of a public park on the remaining 36 acres to be deeded by Midlands to the city. In a "new procedure," Midlands and the city entered into four agreements incorporating the plan. The four agreements, collectively known as the development agreement, were submitted to the city for approval. In February 1985, the city passed an ordinance approving the development agreement, incorporating it as part of the ordinance, and passed five separate ordinances rezoning the Renstrom property. Building permits were then issued, including a permit allowing Midlands to fill in the flood plain of the Big Papillion Creek located on

the land and to make modifications to the creek channel.

Construction on the site began approximately in September of 1985. Thereafter, two lawsuits were filed in the district court for Douglas County: *Giger et al. v. City of Omaha et al.*, filed by neighboring property owners, and *Witherspoon et al. v. City of Omaha et al.*, filed by downstream riparian property owners living along the Big Papillion Creek. The two petitions requested an order declaring the city's rezoning ordinance and accompanying building permits void, and an injunction to enjoin Midlands from developing the property in any manner inconsistent with prior zoning ordinances. The suits were ordered consolidated for trial. After a lengthy trial, the trial court denied the plaintiffs' requested relief.

Though the plaintiffs-appellants assign a total of 15 errors, these errors are consolidated into three issues for consideration on appeal. The first two issues relate to appellants' contention that the trial court erred in not finding that the Omaha City Council acted in an arbitrary, capricious, and unreasonable manner in adopting the rezoning ordinance. Specifically, the appellants allege that the city entered into a development agreement with Midlands, adopted a rezoning ordinance which incorporated that agreement, and rezoned the Renstrom property pursuant to that agreement and that the city adopted the rezoning ordinance without giving adequate consideration to the risk of flood created by the project. The last issue involves appellants' claim that the trial court erred in not granting a permanent injunction enjoining Midlands from filling the flood plain on the Renstrom property and altering the channel of the Big Papillion Creek.

An action to declare a city zoning ordinance void, and to enjoin enforcement under color of that ordinance, is one in equity. *Sasich v. City of Omaha*, 216 Neb. 864, 347 N.W.2d 93 (1984); *Bucholz v. City of Omaha*, 174 Neb. 862, 120 N.W.2d 270 (1963). A case in equity is reviewed de novo on the record, subject to the rule that where credible evidence is in conflict on material issues of fact, we consider and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another. *Thomas v. Marvin E. Jewell & Co., ante* p. 261, 440 N.W.2d 437 (1989); *Sasich v. City of*

*Omaha, supra.*

Zoning is a legislative function, *Schaffer v. City of Omaha*, 197 Neb. 328, 248 N.W.2d 764 (1977); *In re Application of Frank*, 183 Neb. 722, 164 N.W.2d 215 (1969); and 1 R. Anderson, American Law of Zoning § 3.14 (3d ed. 1986), and zoning regulations are enacted pursuant to the police power of the state, *Euclid v. Ambler Co.*, 272 U.S. 365, 47 S. Ct. 114, 71 L. Ed. 303 (1926); *Schaffer v. City of Omaha, supra*; *Davis v. City of Omaha*, 153 Neb. 460, 45 N.W.2d 172 (1950); and 1 R. Anderson, *supra*, § 2.01. The Nebraska Legislature has granted the City of Omaha the power to zone property lying within its jurisdiction. Neb. Rev. Stat. §§ 14-401, 14-402, and 14-403 (Reissue 1987); *Davis v. City of Omaha, supra*. Section 7.09 of the City of Omaha Home Rule Charter provides that the Omaha City Council, by ordinance, may enact, amend, and modify zoning regulations in accordance with the laws of the State of Nebraska. In addition, this jurisdiction has long recognized that zoning ordinances enacted by a city, as a lawful exercise of police power, must be consistent with public health, safety, morals, and the general welfare. Neb. Rev. Stat. §§ 14-102(25) and 14-401 (Reissue 1987); *Schaffer v. City of Omaha, supra*; *Wolf v. City of Omaha*, 177 Neb. 545, 129 N.W.2d 501 (1964); *Bucholz v. City of Omaha, supra*; *City of Omaha v. Cutchall*, 173 Neb. 452, 114 N.W.2d 6 (1962); *Davis v. City of Omaha, supra*; *City of Omaha v. Glissmann*, 151 Neb. 895, 39 N.W.2d 828 (1949), *appeal dismissed* 339 U.S. 960, 70 S. Ct. 1002, 94 L. Ed. 1370 (1950), *reh'g denied* 340 U.S. 847, 71 S. Ct. 15, 95 L. Ed. 621; *Cassel Realty Co. v. City of Omaha*, 144 Neb. 753, 14 N.W.2d 600 (1944).

The first argument raised by the appellants is that the city, by adopting a rezoning ordinance pursuant to an agreement between itself and Midlands, acted in an arbitrary, capricious, and unreasonable manner. In support of this argument, the appellants challenge the validity of the rezoning ordinance on two grounds. They assert, first, that rezoning by agreement is invalid per se and, second, that the rezoning ordinance violates the substantive standards set out in §§ 14-402 and 14-403.

Specifically, the appellants contend that because rezoning by agreement is illegal contract rezoning, it is invalid per se, is an

ultra vires act, and fosters an "appearance of evil." They allege illegal contract rezoning occurred because the city bargained away and sold its police power. The appellants do not cite any Nebraska authority for this proposition and claim that this court has never faced a true contract zoning situation. However, we note that *Bucholz v. City of Omaha, supra,* a case where the city conditioned its granting of a rezoning ordinance on the developer's entering into a protective covenant, has been characterized as an example of contract rezoning. 2 R. Anderson, American Law of Zoning § 9.21 (3d ed. 1986); 1 N. Williams & J. Taylor, American Planning Law, Land Use and the Police Power § 29.03 (rev. 1988). Yet, *Bucholz* has also been labeled as an example of a conditional rezoning. Annot., 70 A.L.R.3d 125, 162 (1976); 2 A. Rathkopf & D. Rathkopf, Rathkopf's the Law of Zoning and Planning § 27.05 (rev. 1989); Note, *The Validity of Conditional Zoning: a Florida Perspective,* 31 U. Fla. L. Rev. 968, 971 n.21 (1979); Comment, *Land Use—Goffinet v. County of Christian: New Flexibility in Illinois Zoning Law,* 8 Loy. U. Chi. L.J. 642, 643 n.15 (1977). This distinction is academic because our scope of review, as explained below, is limited to determining whether the conditions imposed by the city for rezoning are reasonably related to the interest of public health, safety, morals, and the general welfare.

This court realizes that in the development of a project such as One Pacific Place there are negotiations between the developer and the city. We are also aware that a city rezones property based on representations made and plans submitted by the developer. However, once a parcel of land has been rezoned, there is no guarantee the developer will follow through on the plans submitted to the city. Legally, the developer is entitled to use his or her land in any manner permitted by the zoning classification. Of course, the city would not be without a remedy if the land was used in a manner not contemplated in the original plans submitted by the developer. The city could rezone the property to another designation and then institute the appropriate proceedings to prevent the unwanted development. See Neb. Rev. Stat. § 14-415 (Reissue 1987).

However, as *Cummings Enterprises v. Shukert,* 231 Neb.

370, 436 N.W.2d 199 (1989), indicates, this is not always an effective remedy. In *Cummings Enterprises*, the developer's land was rezoned from second suburban district to first commercial. He applied for a building permit for a carwash, a permissible use under that classification, and his request was denied. Subsequently, the city rezoned the developer's property to a classification which excluded carwashes. The developer successfully sued for a writ of mandamus ordering the issuance of the building permit. The city issued the permit, and the developer built the carwash. We held that the city had waived its right to appeal the order, since it voluntarily complied with the order instead of obtaining a supersedeas.

In addition, this court gives great deference to the city's determination of which laws should be enacted for the welfare of the people. *Wolf v. City of Omaha, supra; City of Omaha v. Glissmann, supra.* When the city rezones a parcel of property, we presume the validity of that action absent clear and satisfactory evidence to the contrary. *Bucholz v. City of Omaha*, 174 Neb. 862, 120 N.W.2d 270 (1963); *Davis v. City of Omaha*, 153 Neb. 460, 45 N.W.2d 172 (1950). Therefore, when the city considers a request for rezoning based upon a plan or representation by the developer, it is presumed that the city grants the request after making the determination that the plan as represented is in the interest of public health, safety, morals, and the general welfare. We do not think a developer should be allowed to develop property in a manner inconsistent with the plan or representation on which the rezoning was based, despite the fact that the inconsistent use may be permissible under the new zoning classification. By developing the property in a manner not contemplated by the city in granting the rezoning classification, the developer contravenes a decision made by the city pursuant to its police power for the benefit of the community. If the city is limited to only enacting bare zoning ordinances and is not permitted to insist that developers construct buffer zones or make other changes in order to blend the development into the surrounding community, the city will be stripped of the power to act for the benefit of the general welfare. Accordingly, the city should be permitted to condition rezoning ordinances on the adoption of an agreement between

the developer and the city, or any other means assuring the developer builds the project as represented. At the risk of confusion, but for the sake of convenience, we will refer to this zoning arrangement as conditional zoning. As Rathkopf notes:

> The purpose [of conditional rezoning] is to minimize the negative externalities caused by land development which otherwise benefits the community. The developer may agree to restrict development of its property, make certain improvements, dedicate a portion of land to the municipality, or make payments to the government.
>
> Conditional rezoning is valuable as a planning tool because it permits a municipality greater flexibility in balancing developmental demands against fiscal and environmental concerns. It also provides a municipality with flexibility to meet specific rezoning requests while preserving the integrity of adjacent property. For instance, the agreement can mitigate the harshness of commercial or industrial rezoning on neighboring residential property by requiring a buffer on the zone boundaries. Finally, conditional rezoning allows a municipality to maintain greater control over the development process.

2 A. Rathkopf & D. Rathkopf, Rathkopf's the Law of Zoning and Planning § 27.05 at 27-45 to 27-46 (rev. 1989). Thus, this device allows the city flexibility to extract improvements that bare zoning ordinances do not provide, grants a greater means of control over the development to the city, and gives the city a remedy to enforce the developer's plans and representations. Theoretically, if the rezoning ordinance adopts the plan, as in this case, the city could institute legal proceedings if the developer builds a project inconsistent with the plans without resorting to rezoning the property. For the foregoing reasons we hold conditional rezoning to be valid. Our holding today is a reflection of the trend started in this jurisdiction by *Bucholz* and the growing movement in this country permitting conditional rezonings. 2 A. Rathkopf & D. Rathkopf, *supra.*

However, our holding recognizing the validity of conditional rezoning is not without limitation. Conditional rezoning is a legislative function and therefore must be within the proper exercise of the police power. Accordingly, the conditions

imposed by the city for the rezoning must be reasonably related to the interest of public health, safety, morals, and the general welfare. See, e.g., *Treme v. St. Louis County*, 609 S.W.2d 706 (Mo. App. 1980) (where offer made or exaction demanded for rezoning bears no reasonable relationship to activities of developer, action of county or municipality in rezoning property in exchange for such offer or exaction is contracting away of police power, which is forbidden); *State ex. rel. Myhre v. Spokane*, 70 Wash. 2d 207, 422 P.2d 790 (1967) (amendment to zoning ordinance and concomitant agreement should be declared invalid only if it can be shown that there was no valid reason for change, that they are clearly arbitrary and unreasonable and have no substantial relation to public health, safety, morals, and general welfare, or that city is using concomitant agreement for bargaining and sale to highest bidder or solely for the benefit of private speculators). See 2 A. Rathkopf & D. Rathkopf, *supra*. Hence, to successfully challenge the validity of conditional rezoning, the appellants must prove that the conditions imposed by the city in adopting the rezoning ordinance were unreasonable, discriminatory, or arbitrary, and that the regulation bears no relationship to the purpose or purposes sought to be accomplished by the ordinance. This is the same test used for testing the validity of zoning ordinances in this jurisdiction. See, *Wolf v. City of Omaha*, 177 Neb. 545, 129 N.W.2d 501 (1964); *Bucholz v. City of Omaha*, 174 Neb. 862, 120 N.W.2d 270 (1963); *City of Omaha v. Cutchall*, 173 Neb. 452, 114 N.W.2d 6 (1962); *City of Omaha v. Glissmann*, 151 Neb. 895, 39 N.W.2d 828 (1949); *Cassel Realty Co. v. City of Omaha*, 144 Neb. 753, 14 N.W.2d 600 (1944). "The validity of a zoning ordinance will be presumed in the absence of clear and satisfactory evidence to the contrary." *Bucholz v. City of Omaha, supra* at 865-66, 120 N.W.2d at 273, citing *Davis v. City of Omaha*, 153 Neb. 460, 45 N.W.2d 172 (1950).

The appellants argue that by entering into the development agreement the city has curtailed or bargained away its police powers because (1) the agreement prohibits amendment without the consent of the developer; (2) the city is committed to approve a PUD "without any present indication as to what

such PUD's might contain"; (3) the city is obligated to issue building permits "without regard to compliance with other building codes, rules and regulations of the City"; (4) the city is required to spend $64,700 for offsite improvements; (5) the agreement mandates the manner in which the city is to levy special assessments for the payments of these improvements; and (6) "[t]hroughout the Subdivision Agreement [one of the agreements in the development agreement], the City obligates itself to deal in many ways involving its legislative and administrative authority with a non-existent Sanitary and Improvement District to be created in the future." Brief for appellants Witherspoon et al. at 18-19. However, the plain language in the provisions of the development agreement contradict appellants' contentions. The development agreement in pertinent part provides:

SECTION 2. DEVELOPMENT PLAN.

2.1 Except as otherwise permitted by this agreement, One Pacific Place shall be developed in accordance with the development plan . . . .

2.2 Midlands reserves the right to modify the Development Plan in any or all of the following ways, *provided* that such modifications do not violate any provisions of the Omaha Municipal Code, *and* the City agrees that any or all of such modifications shall not constitute a violation of Section 2.1:

2.2.1 As long as the Site Development Regulations are not violated, Midlands may alter the location, physical shape, and exterior dimensions of any structure shown on the Development Plan, within the boundaries of any platted lot.

2.2.2 As long as the Site Development Regulations are not violated, Midlands may reduce the number of office buildings shown on the Development Plan from three (3) to two (2).

2.2.3 As long as the Site Development Regulations are not violated, Midlands may reduce the number of commercial buildings shown in the Retail Center on the Development Plan from four (4) to either three (3) or two (2).

2.2.4 As long as the Site Development Regulations are not violated, Midlands may increase or decrease the number of residential structures shown on the Development Plan, provided that the average density on land used for residential purposes in One Pacific Place is no less than fifteen (15) Dwelling Units per gross acre.

2.2.5 As long as the Site Development Regulations are not violated, with the approval of the Planning Director of the City, Midlands may alter the location and design of any off-street surface parking area shown on any platted lot on the Development Plan, so long as such alteration does not increase or decrease the paved surface (excluding medians, landscaped areas, and other portions of the parking area not designed for vehicular access, circulation, or parking) of such parking area by more than twenty percent (20%) from that shown on such lot on the Development Plan. . . .

2.3 *None of the foregoing provisions shall be construed to imply any waiver of any provision of Chapter 55, Chapter 53, or any other section of the Omaha Municipal Code.*

. . . .

SECTION 9. MISCELLANEOUS PROVISIONS.

. . . .

9.2 All amendments of this agreement shall require approval by the City Council of the City and by Midlands or the successor owners of the real estate . . . . This provision *shall not* abrogate any legal remedies available to the City Council of the City or the Planning Director of the City (as provided in the Omaha Municipal Code) under the Omaha Municipal Code . . . .

(Emphasis supplied.) Simply stated, the agreement expressly provides that Midlands may vary the development only if the city does not find the variation deviates from the development plan *and* the variations do not violate *any* provision of the Omaha Municipal Code. Clearly, under this agreement, the powers of the city are unchanged. We fail to see how the development agreement can be construed as bargaining away the city's police power.

In fact, this agreement is in reality an enhancement of the city's police power. An examination of the development agreement and the evidence at trial establishes that the agreement provides more restrictive ceilings and development regulations than the current underlying zoning regulations. For example, a portion of the development, where the office buildings will be located, has been rezoned to ninth residence district (R-9). Absent the agreement, according to Omaha Mun. Code, ch. 55, art. XV, §§ 55-311 et seq. (1983), under the R-9 classification Midlands is free to erect any number of office buildings with no real limitations on the amount of square footage. Here, the agreement restricts Midlands to a maximum of three office buildings and a total of 390,000 square feet of office space.

In sum, we find that there is not clear and satisfactory evidence to support the appellants' contention that the city has bargained away its police power. The evidence clearly shows that the city's police powers are not abridged in any manner and that the agreement is expressly subject to the remedies available to the city under the Omaha Municipal Code. Further, we find that the agreement actually enhances the city's regulatory control over the development rather than limiting it.

The appellants' second contention is that the city engaged in an ultra vires act because there is no statutory enabling act permitting conditional rezoning. The well-settled rule in this jurisdiction is that

> "a municipal corporation 'possesses, and can exercise, the following powers, and no others: First, those granted in express words; second, *those necessarily or fairly implied in or incident to the powers expressly granted*; third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable.' "

(Emphasis supplied.) *Jacobs v. City of Omaha*, 181 Neb. 101, 104, 147 N.W.2d 160, 163 (1966), citing *Christensen v. City of Fremont*, 45 Neb. 160, 63 N.W. 364 (1895). As set forth above, the City of Omaha derives the power to zone from §§ 14-401, 14-402, and 14-403, and § 7.09 of the Omaha Home Rule Charter. Section 7.09 provides that the city may enact, amend,

and modify zoning regulations in accordance with the laws of the State of Nebraska. An examination of chapter 14, article 4, of the Nebraska Revised Statutes reveals that all the statutes contained therein primarily use the term "regulations" for describing the zoning power delegated to the city. The Legislature does not specify what regulations the city may use to zone the city. The only limitation is that the regulations must be for "the purpose of promoting the health, safety, morals or the general welfare of the community . . . ." § 14-401. In addition to having the power to enact zoning regulations, the city also has the power to amend, supplement, change, modify, or repeal those regulations. § 14-405. Further, § 14-403 in part provides:

> Whenever the City council shall determine that the use or contemplated use of any building, structure or land will cause congestion in the streets, increase danger from fire or panic, imperil public safety, cause undue concentration or congregation of people, or impede transportation, the council may include in such regulations requirements for alleviating or preventing such conditions when any change in use or zoning classification is requested by the owner.

It is axiomatic that zoning is a local concern. In light of this, plus the fact that the Legislature has used the general term "regulations" without explicitly delineating what regulations the city is permitted to use, coupled with a grant of power to the city to implement, amend, supplement, change, modify, or repeal those regulations, it is clear that the Legislature has given the city broad powers to regulate land uses within its jurisdiction as long as those regulations are within the police power. Thus, we find in chapter 14 of the Nebraska Revised Statutes an implied grant of power to the city to enact all necessary zoning regulations, including conditional rezoning, as long as those regulations are within the proper exercise of the police power.

The third contention by the appellants is that the city fostered an "appearance of evil" by engaging in conditional rezoning. They allege that conditional rezoning could result in corruption of officials and that if the practice is permitted, officials will concentrate more on what they can extract from the developer than on proper rezoning criteria. This argument lacks merit.

The appellants admit there is no evidence of graft or corruption in the case at bar, and we believe our holding is more than adequate to protect against any alleged abuse of this type. We will not strike down a conditional zoning because it looks evil, but only if its application is evil. Accordingly, appellants' challenge to this conditional rezoning as invalid fails.

The appellants' next challenge is that the rezoning ordinance violates the substantive standards of §§ 14-402 and 14-403. To successfully challenge the validity of a zoning ordinance, the appellants must prove that the actions of the city in adopting that regulation were unreasonable, discriminatory, or arbitrary, and that the regulation bears no relationship to the purpose or purposes sought to be accomplished by the ordinance. *Wolf v. City of Omaha*, 177 Neb. 545, 129 N.W.2d 501 (1964); *Bucholz v. City of Omaha*, 174 Neb. 862, 120 N.W.2d 270 (1963); *City of Omaha v. Cutchall*, 173 Neb. 452, 114 N.W.2d 6 (1962); *City of Omaha v. Glissmann*, 151 Neb. 895, 39 N.W.2d 828 (1949); *Cassel Realty Co. v. City of Omaha*, 144 Neb. 753, 14 N.W.2d 600 (1944). In the absence of clear and satisfactory evidence to the contrary, a zoning ordinance is presumed valid. *Bucholz v. City of Omaha, supra*; *Davis v. City of Omaha*, 153 Neb. 460, 45 N.W.2d 172 (1950). The appellants contend the rezoning ordinance (1) violates the uniformity requirement in § 14-402, (2) will diminish the value of the surrounding homes, (3) violates § 14-403, (4) is not in accordance with a comprehensive plan, and (5) constitutes illegal spot zoning.

Section 14-402 provides in part:

> For any or all such purposes, the city council may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of sections 14-401 to 14-418. Within such districts it may regulate, restrict, or prohibit the erection, construction, reconstruction, alteration, or use of buildings, structures, or land. *All such regulation shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts.*

(Emphasis supplied.) The appellants assert that the rezoning ordinance violates the uniformity provision in § 14-402 because

the agreement results in concessions for both the city and Midlands which are not allowed to other developers. As an example, appellants state in their brief that " '[n]o other developers in the City' have 'been required to give a park for free to the City in exchange for rezoning.' " Brief for appellants Witherspoon et al. at 14. We note that the uniformity requirement in § 14-402 is derived from § 2 of the Standard State Zoning Enabling Act and that almost every jurisdiction has incorporated this limitation into its state zoning enabling legislation. 1 R. Anderson, American Law of Zoning § 5.25 (3d ed. 1986). In his treatise on zoning, Anderson states that there have been few cases interpreting the uniformity requirement and that attacks on conditional rezoning as being violative of the uniformity requirement have "not been notably successful." 2 R. Anderson, American Law of Zoning § 9.20 at 164 (3d ed. 1986); 1 R. Anderson, *supra*, § 5.25. The jurisdictions that have addressed the uniformity requirement have analyzed the challenged ordinances to see if they are reasonable and not discriminatory. 1 R. Anderson, *supra*, § 5.25. For instance, in *Mont. Co. v. Woodward & Lothrop*, 280 Md. 686, 719-20, 376 A.2d 483, 501 (1977), the court, construing a uniform provision comparable to Nebraska's, said:

> The uniformity provision contained in Art. 66D, § 8-102 was derived from § 2 of the Standard State Zoning Enabling Act, as to which it was said in 1 Anderson, *American Law of Zoning*, § 5.22 (2d ed. 1976), that the purpose of the provision was mainly a political rather than a legal one, *i.e.*, to give notice to property owners that there shall be no improper discriminations. [Citations omitted.] We have also recognized that invidious distinctions and discriminations in applying the uniformity requirement are impermissible. [Citations omitted.] The uniformity requirement does not prohibit classification within a district, so long as it is reasonable and based upon the public policy to be served.

See, *Oshtemo Twp v Central Ad Co*, 125 Mich. App. 538, 336 N.W.2d 823 (1983) (township rural zoning act, providing that zoning ordinance provisions must be uniform for each class of

land, buildings, dwellings, and structures throughout the district, is subject to "reasonableness" exception, allowing reasonable restrictions based upon different conditions within the zone); *Quinton v. Edison Park Development Corp.*, 59 N.J. 571, 285 A.2d 5 (1971) (statute which required that zoning regulations be uniform for each class or kind of buildings or other structures or uses of land throughout each district does not prohibit classifications within a district so long as they are reasonable).

We think allowing reasonable classifications within a district is a good rule, especially in view of the broad delegation of authority given by the Legislature to the city in making zoning regulations, as set forth above. Accordingly, the uniformity requirement in § 14-402 does not prohibit reasonable classifications within a district. To successfully challenge the rezoning ordinance on the grounds it violates the uniformity requirement of § 14-402, the appellants must prove that the actions of the city in adopting the rezoning ordinance were unreasonable, discriminatory, or arbitrary, and that the regulation bears no relationship to the purpose or purposes sought to be accomplished by the ordinance.

Other than pointing to the provisions of the agreement itself, the appellants cite no evidence in support of their claim that the rezoning action violates the uniformity requirement. Implicit in appellants' proposition is the assumption that no other developer will be able to take advantage of conditional rezoning. Today's holding clearly refutes that assumption. The appellants have failed to show by clear and satisfactory evidence, *Bucholz v. City of Omaha*, 174 Neb. 862, 120 N.W.2d 270 (1963), and *Davis v. City of Omaha*, 153 Neb. 460, 45 N.W.2d 172 (1950), that the city acted in an unreasonable, discriminatory, or arbitrary manner, and that the regulation bears no relationship to the purpose sought to be accomplished by the ordinance.

The contentions that the rezoning ordinance will result in devaluating the surrounding homes and violates § 14-403, we analyze together. Section 14-403 provides:

> Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in

the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to secure safety from flood; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements, and to promote convenience of access. Such regulation shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. Whenever the city council shall determine that the use or contemplated use of any building, structure or land will cause congestion in the streets, increase the danger from fire or panic, imperil public safety, cause undue concentration or congregation of people, or impede transportation, the council may include in such regulations requirements for alleviating or preventing such conditions when any change in use or zoning classification is requested by the owner.

The city, in adopting a rezoning ordinance, is not required to accomplish all the objectives of § 14-403. *Sasich v. City of Omaha*, 216 Neb. 864, 347 N.W.2d 93 (1984). There was competent conflicting evidence on nearly all of the considerations set out in § 14-403. Both sides presented evidence regarding the impact One Pacific Place would have on traffic in the area. The appellants' expert testified that the development would increase traffic congestion and the potential for accidents along Pacific Street. Citing improvements to Pacific Street, such as widening the street, as called for in the development plan, the appellees' expert stated that the traffic congestion would actually decrease because of the improved levels of service at intersections along the street. Both sides presented evidence relating to the adequacy of the 36-acre park, as provided for by the development agreement. Here the thrust of the appellants' evidence was to exhibit that the city's previous master plans designated the entire Renstrom tract for future use as parkland and to demonstrate a need for

an 84-acre public park in the area of the development. The appellees countered with evidence indicating that the city did not have the financial resources available to fund the acquisition of the Renstrom property for a public park and that the city obtained the 36 acres for a park free from the developer through a process of negotiation. In addition, the park deeded by Midlands to the city is consistent with the current parks and recreation plan, which calls for the accumulation of linear parkland along the Big Papillion Creek. The evidence also demonstrates that there are over 200 acres of smaller parks in the area and that the studies the appellants' expert relied on in finding parkland in the Renstrom area deficient were overstated. As will be set out later in this opinion, there also was conflicting evidence relating to the impact One Pacific Place would have on flooding of downstream riparian owners.

The appellees failed to rebut the appellants' contention that the project would decrease the surrounding land values. However, the mere fact that rezoning will depreciate the value of surrounding property does not establish that the rezoning is illegal. *Bucholz, supra.* At most, the evidence establishes that there is a difference of opinion regarding the impact of the development. "Where the validity of the legislative classification for zoning purposes is fairly debatable, the legislative judgment must be allowed to control." *Bucholz, supra* at 868-69, 120 N.W.2d at 275. Giving credit to the fact the trial court heard and observed the witnesses, we cannot say the court was wrong in accepting the appellees' version of what the impact of the development would be. *Sasich v. City of Omaha, supra.* We also note that these issues relating to the impact of the development raised by the appellants were also raised before the city council in opposition to appellees' request for rezoning.

" 'What is the public good as it relates to zoning ordinances affecting the use of property is, primarily, a matter lying within the discretion and determination of the municipal body to which the power and function of zoning is committed, and unless an abuse of this discretion has been clearly shown it is not the province of the court to interfere. . . .

" 'In passing upon the validity of zoning ordinances, an

appellate court should give great weight to the determination of local authorities and local courts especially familiar with local conditions.' . . ."
*Wolf v. City of Omaha*, 177 Neb. 545, 556, 129 N.W.2d 501, 508 (1964). Accordingly, we find that the appellants' contentions that the rezoning ordinance will result in devaluating the surrounding homes and violates § 14-403 are without merit.

We also address the appellants' last two challenges together: the allegations that the rezoning ordinance is not in accordance with a comprehensive plan and that it constitutes illegal spot zoning. Relying on the first sentence of § 14-403, "Such regulations shall be made in accordance with a comprehensive plan," the appellants assert that the project violates the city's comprehensive plan. According to the appellants, the project violates the city policy as detailed in several city master plans from 1965 up to the latest plan in 1981 by (1) failing to restrict high-density/mixed uses, such as One Pacific Place, to the Dodge Street corridor; (2) utilizing the Renstrom property for development instead of parkland; and (3) locating One Pacific Place, a high-density project, in a low-density area.

This court said in *Sasich v. City of Omaha, supra*, that the terms "comprehensive plan" and city plan or master plan are not synonymous and that to determine whether an ordinance complies with a comprehensive plan is not a mechanical test.

It is apparent from [*Davis v. City of Omaha*, 153 Neb. 460, 45 N.W.2d 172 (1950),] that the term "comprehensive plan" is used with respect to a metropolitan city in its generic sense and does not refer to any special document. The essence of the term "comprehensive plan" implies that not just the subject property but other similarly situated property is considered in the zoning decision. It requires rationality and some degree of consistent treatment.

*Sasich, supra* at 870, 347 N.W.2d at 97. In applying this definition, the *Sasich* court examined the future land use plan and the surrounding area of the rezoned property. In essence, that court reviewed the surrounding uses utilizing a spot zoning analysis. "The term 'spot zoning' is used by the courts to describe a zoning amendment which is invalid because it is not

in accordance with a *comprehensive or well-considered plan*." (Emphasis supplied.) 1 R. Anderson, American Law of Zoning § 5.12 at 359 (3d ed. 1986). Concerning spot zoning, this court has stated:

[S]pot zoning [is] generally defined as the singling out of a small parcel of land for a use or uses classified differently from the surrounding area, primarily for the benefit of the owner of the property so zoned, to the detriment of the area and the other owners therein. . . . "The validity of spot zoning depends upon more than the size of the spot, and spot zoning as such is not necessarily invalid, but its validity depends upon the facts and circumstances appearing in each particular case." Hagman, [Urban Planning & Development Control Law], § 93, p. 169, analyzes spot zoning in the following fashion: "Spot zoning is invalid where some or all of the following factors are present:

"1. a small parcel of land is singled out for special and privileged treatment;

"2. the singling out is not in the public interest but only for the benefit of the landowner;

"3. the action is not in accord with a comprehensive plan.

"The list is not meant to suggest that the three tests are mutually exclusive. If spot zoning is invalid, usually all three elements are present, or, said another way, the three statements may merely be nuances of one another."

*Holmgren v. City of Lincoln*, 199 Neb. 178, 184-85, 256 N.W.2d 686, 690-91 (1977).

In reviewing the evidence, we note that there is conflicting evidence on the type of land use proposed for One Pacific Place, and on the classification of the land uses surrounding the development. The appellants' evidence was that One Pacific Place is a high-density/mixed-use development, that such high-density uses are designated by the city's master plan and policy to be limited to within one-half mile of Dodge Street, and that One Pacific Street is outside of the $\frac{1}{2}$-mile Dodge Street corridor. The appellants provided expert testimony that the prevailing land use within a 1-mile radius is low-density

residential. On the other hand, appellees produced evidence demonstrating that the area surrounding the development was composed of both low- and high-density mixed uses. This included an admission by one of the appellants' experts that there are some seven-story apartment buildings across Pacific Street and west of One Pacific Place which are high-density residential uses and that there are high-density three- to four-story office buildings along the south one-half of Regency Parkway between Pacific Street and West Dodge Street. Other evidence by the appellees showed that Pacific Street west of the development is high-density residential area, that Pacific Street east of the development has commercial uses, and that there are substantial commercial uses at Pacific Street and 87th Street, 105th Street, and Interstate 680.

Where there is a conflict in the evidence, the legislative decision must be allowed to control. *Bucholz v. City of Omaha*, 174 Neb. 862, 120 N.W.2d 270 (1963). Giving credit to the fact that the trial judge observed the witnesses and accepted the appellees' version of the facts, *Sasich v. City of Omaha*, 216 Neb. 864, 347 N.W.2d 93 (1984), we find the appellants have failed to prove by clear and convincing evidence that the rezoning ordinance was illegal spot zoning and therefore violative of the comprehensive plan. Accordingly, appellants' first consolidated assignment of error is without merit.

The appellants' second consolidated assignment of error relates to their contention that the city acted in an arbitrary, capricious, and unreasonable manner by giving inadequate consideration to the risk of flood created by the project. Prior to the commencement of construction on the Renstrom property, 90 percent of the property was within the flood plain of the Big Papillion Creek and 60 percent of that land was in the creek's floodway. The flood plain is the area of land adjoining the Big Papillion Creek which has been or may be covered by flood waters. Neb. Rev. Stat. § 31-1010 (Reissue 1988); Omaha Mun. Code, ch. 55, art. V, § 55-112 (1982). The floodway is the channel of the Big Papillion Creek and adjacent lands that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than 1 foot. Neb. Rev. Stat. § 31-1008 (Reissue 1988); Omaha Mun.

Code, *supra*, § 55-112. The base flood is the flood having a 1-percent chance of being equaled or exceeded in any given year. Neb. Rev. Stat. § 31-1005 (Reissue 1988); Omaha Mun. Code, *supra*, § 55-112. The base flood is also known as the 100-year flood. The concept of the floodway is used so development may occur in a flood plain and at the same time guarantee the other riparian owners protection from flooding. By definition, the floodway is included within the flood plain. The floodway can be narrower than the flood plain, but only if the floodway is large enough to discharge a 100-year flood without the surface elevation of the water rising more than 1 foot. The remaining area in the flood plain not included in the floodway is called the flood fringe. Ideally, if a floodway is properly constructed, the 100-year flood should be entirely contained in the floodway, leaving the flood fringe dry. Once a floodway has been established, construction is permitted in the flood fringe. The City of Omaha, as a participant in the federal flood insurance program, has adopted the floodway for the Big Papillion Creek as established by the Federal Emergency Management Agency (FEMA) in its 1982 flood insurance study.

To gain more ground for development, Midlands decided to move the existing floodway closer to the Big Papillion Creek. The final plan called for filling of the flood fringe and a portion of the existing floodway. Midlands applied to the city for the appropriate permits, and the city in turn applied to FEMA on behalf of Midlands for a map amendment moving the floodway. On July 15, 1985, FEMA gave conditional approval to Midlands for the channel modifications along the Big Papillion Creek. In September 1985, the appellants submitted information to FEMA challenging the preliminary determinations. After reviewing the information, FEMA rejected the challenges and sent a letter to the city on October 29, indicating that there was no basis for withdrawing the conditional approval. In July 1986, the appellants appealed FEMA's determination, which appeal was ultimately rejected. The map amendment was granted by FEMA, creating a new floodway, and the city issued a development permit in September 1986 to allow construction in the newly designated flood fringe area. On November 14 appellant Giger filed *Giger*

*v. FEMA et al.* in the U.S. District Court for the District of Nebraska, requesting the court to set aside FEMA's decision.

The primary thrust of appellants' attack is the assertion that the city abused its discretion by adopting the map amendment issued by FEMA and issuing the permits to Midlands for filling the new flood fringe. The U.S. Congress has enacted laws creating a national flood insurance program and has delegated the implementation of the program to FEMA. See, generally, 42 U.S.C. §§ 4001 et seq. (1982); 44 C.F.R. §§ 59.1 et seq. (1987). FEMA, pursuant to this delegation of authority, is responsible for establishing the minimum criteria for flood plain management. 44 C.F.R., *supra*, § 60.1. In addition to using the theoretical concepts of flood plain, floodway, and flood fringe as explained above, FEMA has undertaken water studies of various flood-prone waterways such as the Big Papillion Creek. These studies, known as flood insurance studies, establish such things as water elevations and plot the flood plain, floodway, and flood fringes of the watercourses studied. This data is compiled and distributed in the form of maps, 44 C.F.R., *supra*, §§ 65.1 to 65.11, and can be amended by an appeal process. 44 C.F.R., *supra*, §§ 67.1 to 70.9. To be eligible for federal flood insurance under this program, a community must adopt the standards established by FEMA. 44 C.F.R., *supra*, § 60.1. Section 60.2(h), defining minimum compliance with flood plain management criteria, states: "The community shall adopt and enforce flood plain management regulations based on data provided by [FEMA]. Without prior approval of [FEMA], the community *shall not* adopt and enforce flood plain management regulations based upon modified data reflecting natural or man-made physical changes." (Emphasis supplied.)

The Nebraska Legislature has also enacted statutes regulating flood plain management. See, generally, Neb. Rev. Stat. §§ 31-1001 to 31-1031 (Reissue 1988). One of the express purposes of the flood plain management legislation is to "[e]ncourage local governments with flood-prone areas to qualify for participation in the national flood insurance program." § 31-1001(d). "National flood insurance program shall mean the program authorized by the United States

Congress under the National Flood Insurance Act of 1968, as amended, 42 U.S.C., sections 4001 to 4128." § 31-1014. The statutory scheme encourages implementation of local flood plain management regulation under the direction of the Nebraska Natural Resources Commission (NRC). Specifically, § 31-1031 provides:

(1) The authorities granted by sections 31-1024 to 31-1031 [provisions for flood plain management by the Department of Water Resources] are intended to be exercised by the department only on an interim basis to prevent irreversible development of flood-prone areas prior to the initiation of an adequate local flood plain management program in accordance with section 31-1019 or sections 31-1020 and 31-1021. Such authorities are not intended to substitute for local flood plain management programs when sufficient flood hazard data and maps are available. The authority of the department over the flood plain of any watercourse or drainway identified in accordance with section 31-1025 or 31-1026 shall terminate immediately upon the effective date of an adequate local program which encompasses the same land area. For purposes of this section, *a local program shall be considered adequate if it entitles the local government to participate in the regular program of the national flood insurance program, or if the commission has reviewed the local program and has certified that it is consistent with the minimum standards adopted in accordance with subdivision (5) of section 31-1017. . . .*

(2) The commission shall be responsible for monitoring the status of all local flood plain management programs . .
. .

(Emphasis supplied.) Section 31-1017, defining the powers and duties of the NRC, states that

the commission shall be the official state agency for all matters pertaining to flood plain management. In carrying out that function, the commission shall have the power and authority to:

. . . .

(5) Prepare, adopt, and promulgate, by rule or

regulation, minimum standards for local flood plain management regulation. . . . Such minimum standards shall be designed to protect human life, health, and property, and to preserve the capacity of the flood plain to discharge the waters of the base flood . . . . *If deemed necessary by the commission to adequately accomplish the purposes of sections 31-1001 to 31-1031, such standards may be more restrictive than those contained in the national flood insurance program standards, except that the commission shall not adopt standards which conflict with those of the national flood insurance program in such a way that compliance with both sets of standards is not possible.*

(Emphasis supplied.) The duties of local governments concerning flood plain management are set forth in § 31-1019, which provides in pertinent part:

When the commission, a federal agency, or any other entity has provided a local government with sufficient data and maps with which to reasonably locate within its zoning jurisdiction any portion of the flood plain for the base flood of any watercourse or drainway, *it shall be the responsibility of such local government to adopt, administer, and enforce flood plain management regulations which meet or exceed the minimum standards adopted by the commission pursuant to subdivision (5) of section 31-1017.*

(Emphasis supplied.) By enacting these statutes, it is clear that the legislative purposes are to encourage local governments with flood-prone areas to implement effective flood plain management regulations and qualify for participation in federal flood insurance programs, and to require local governments to adopt local flood plain management regulations which meet the minimum criteria established by the NRC. Pursuant to § 31-1017, the NRC is required to establish, at a minimum, the standards adopted by FEMA.

In accordance with federal and state statutes, the City of Omaha has adopted local regulations for flood plain development. Omaha Mun. Code, ch. 55, art. V, §§ 55-111 to 55-123 (1982), set forth the city's flood plain regulations.

Section 55-113 states:

It is the purpose of this article to promote the public health, safety and general welfare and to minimize losses by applying the provisions of this article to . . . (4) Assure that eligibility is maintained for property owners in the community to purchase flood insurance in the National Flood Insurance Program; (5) Comply with the Minimum Standards of the State of Nebraska Flood Plain Regulation Act.

Section 55-112 provides the following definitions:

*Floodplain*: Those lands which are subject to a one (1) percent or greater chance of flooding in any given year. *The designated floodplain for this article shall be based on the areas of one hundred (100) year flood, or areas of special flood hazards, as shown on the flood hazard boundary map, flood boundary and floodway map or flood insurance rate map issued by the Federal Insurance Administration, Federal Emergency Management Agency*, and shall include Zone A and Zones A-1 through A-30.

. . . .

*Floodway*: The channel of a river [or] other watercourses and the adjacent lands [sic] areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one (1) foot. *The designated floodway for this article shall be based on those areas delineated on the flood boundary and floodway map issued by the Federal Insurance Administration, Federal Emergency Management Agency*.

(Emphasis supplied.) Thus, as mandated by state statute, the city has implemented local flood regulation and has adopted standards which meet the minimum criteria established by the NRC—the standards promulgated by FEMA. Accordingly, any changes of those standards by FEMA establish a new minimum threshold which the NRC and the city are required by law to meet. When FEMA approved the map amendments establishing a new floodway for the Big Papillion Creek adjacent to the Renstrom property, the city was obligated by

statute and local ordinance to adopt those changes. Further, even if the city did not act under compulsion of law, the city's adoption of FEMA's standards ensured its eligibility within the federal flood insurance program, a decision by the city we find within the proper exercise of the police power. We cannot say that the city acted in an arbitrary, capricious, or unreasonable manner by adopting FEMA's map amendments and issuing the permits to Midlands for construction in the old floodway and flood fringe.

The appellants contend that the scientific information used by FEMA for amending the map and changing the floodway was incorrect. We do not review the evidence in connection with this contention because under the supremacy clause this court has no power of review over a federal agency such as FEMA. Any opinion by this court over the validity of FEMA's action would be merely advisory. It is not the function of this court to render advisory opinions. *State v. Rust*, 223 Neb. 150, 388 N.W.2d 483 (1986), *cert. denied* 481 U.S. 1042, 107 S. Ct. 1987, 95 L. Ed. 2d 826 (1987). The appellants' proper avenue of judicial review, which the evidence indicates one of them has taken advantage of, lies with the federal courts. In addition, because this issue is being reviewed under this court's equity jurisdiction, the appellees urge dismissal of this issue, as the appellants have an adequate remedy at law in the federal courts. While noting that the appellants will only have an adequate remedy at law if the federal district court rules in their favor, we find, instead, that appellants have failed to meet their burden of proof to show by clear and satisfactory evidence that the city council's action in adopting the rezoning ordinance was arbitrary, capricious, or unreasonable. The appellants' second consolidated assignment of error lacks merit.

The last consolidated assignment of error is that the district court erred by not entering an injunction against Midlands preventing Midlands from filling in the flood plain and making modifications to the channel of the Big Papillion Creek.

An action for injunction sounds in equity. [Citation omitted.] "In an appeal of such an action, this court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court;

provided, where the credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. . . . In its de novo review of the record of this case, this court is guided by the rule that a party seeking injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief."

*Federal Land Bank of Omaha v. Swanson*, 231 Neb. 868, 870, 438 N.W.2d 765, 767 (1989).

"The flood plain of a stream is considered a part of the channel of such stream, and no one may obstruct the flow of floodwaters in the natural drainage to the detriment of another." *Kluck v. Mentzer*, 217 Neb. 8, 10, 347 N.W.2d 306, 308 (1984), citing *Bahm v. Raikes*, 160 Neb. 503, 70 N.W.2d 507 (1955). Because the appellants contend the scientific information used by FEMA was incorrect, their briefs concentrate on the allegedly improper information used by FEMA. Though this contention is irrelevant, the record does contain some evidence indicating that the project would increase water levels and velocity, causing increased flooding and erosion downstream. However, our review of the record indicates that the appellants have failed to establish by a preponderance of the evidence that the development would cause the flooding problems they allege. The record shows that prior development upstream of the development has interfered with the natural flow of the watercourse, significantly increasing the risk of downstream flooding regardless of the impact One Pacific Place may have.

Further, there was competent conflicting evidence on the impact the development would have on the Big Papillion Creek. The appellees' expert testified that the project would have no impact on downstream flooding and that if there was any impact on the velocities of the water, water velocity would actually decrease. Given the state of the evidence, we cannot say the trial judge was incorrect in ruling for the appellees, nor do we find that the appellants established by a preponderance of the evidence every controverted fact necessary to entitle them to

relief.

Accordingly, the decision of the district court for Douglas County denying appellants' request for relief is hereby affirmed.

AFFIRMED.