CITIZENS STATE BANK, A NEBRASKA BANKING CORPORATION, APPELLANT, V. JENNINGS STATE BANK, A NEBRASKA BANKING CORPORATION, APPELLEE.

461 N.W.2d 78

Filed October 5, 1990.    No. 88-750.

Scott J. Norby, of Crosby, Guenzel, Davis, Kessner & Kuester, for appellant.

John R. Brownell, of Lauritsen, Brownell, Brostrom & Stehlik, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This is an action brought under the Nebraska Uniform Fraudulent Conveyance Act, Neb. Rev. Stat. §§ 36-601 et seq. (Reissue 1988). The plaintiff-appellant, Citizens State Bank, seeks to set aside a conveyance of a building made to the defendant-appellee, Jennings State Bank, from the Jennings Agency, Inc. (Agency). Citizens State requested that the district court enter an order under § 36-609 disregarding the conveyance so as to permit its judgment lien to attach.

On August 24, 1988, the district court filed its order that held that Citizens State failed to show by convincing evidence that fraud against it existed in the transfer of $300,000 from Jennings State to the Agency on December 31, 1981, or that fraud existed in the delivery of the deed on March 11, 1986. The court entered judgment in favor of Jennings State. Citizens State appeals that judgment to this court.

Citizens State claims that the district court erred in failing to find that the conveyance made by the Agency to Jennings State was made with the intent to hinder, delay, or defraud Citizens State as a creditor of the Agency. Citizens State also claims that the district court erred in failing to find that the transferee, Jennings State, knew or should have known that the conveyance by the Agency to it was made with the intent to hinder, delay, or defraud Citizens State as a creditor of the Agency.

In 1975, Melvin Douglas Jennings inherited a controlling interest in Jennings State and the Agency. Jennings was the president and director of both of these entities. The Agency and Jennings State are located in the same building in Davenport, Nebraska. At the time Jennings inherited his interest, the Agency owned the building, and Jennings State paid the Agency $300-per-month rent for the space it occupied.

Jennings State and the Agency have historically shared numerous officers, directors, and shareholders, most of whom

are related by blood or marriage. At one time or another most of these people served as officers and/or directors of Jennings State and/or the Agency.

Within 2 or 3 years after acquiring his interest in Jennings State and the Agency, Jennings acquired a 50-percent interest in a business known as Broadcast Management, which held the license for a radio station in Durango, Colorado. At about the same time Jennings also acquired a 100-percent interest in a corporation known as Great Plains Broadcasting, which was the licensee of a radio station in Fairbury, Nebraska. Jennings was the president and director of both of these companies.

In 1977, Citizens State began a lending relationship with Jennings personally, the Agency, Broadcast Management, and Great Plains Broadcasting. The Agency executed approximately 20 promissory notes to Citizens State beginning in July 1977. At no time did Citizens State request security for the loans, either in the form of a mortgage on the bank building or in the form of Agency stock.

Lloyd E. Van Cleef, president of Citizens State, began the lending relationship with Jennings and his related business interests. Van Cleef was a longtime friend of Jennings'. Van Cleef was also personally indebted to Jennings State in the amount of $190,000 to $220,000 from 1976 through 1986, and was unable to service this debt in 1986. Van Cleef negotiated a settlement with Jennings of this debt for about $200,000, in February and March 1986.

In 1980, Jennings desired to make improvements to the bank building. Because the building was owned by the Agency, the Agency needed to get financing to make the improvements. Jennings wanted the Agency to borrow the money from Jennings State. By resolution of the board of directors of Jennings State, the Agency was extended a $200,000 line of credit. Because Jennings was the president and director of both entities, there was concern that this loan would be termed an "insider loan" under the rules of the Federal Deposit Insurance Corporation and the Nebraska banking laws. Because of this problem, the board of directors also resolved that if the loan violated state or federal law, the loan would immediately be called in by Jennings State and paid back by the Agency.

Jennings obtained a verbal commitment from his brother-in-law, Dan Fisher, president of the Crawford State Bank, for the improvement loan in the event the Jennings State loan was disapproved. However, Jennings State proceeded with the transaction before getting any approval from the FDIC or the Nebraska banking department.

Nearly 1 month later, Frank Landis, Jr., secretary of the board of directors of Jennings State and a cousin of Jennings', sought verbal and written approval from the Nebraska banking department. The department answered in writing that the loan was legal within the limits of Neb. Rev. Stat. § 8-149 (Reissue 1987). In 1981, during the regular course of examination of Jennings State by the FDIC, the FDIC discovered the loan and disapproved it. The FDIC directed Jennings State to call in the line of credit. The Agency loan was paid in full on August 26, 1981, by debit to the First National Bank of Fairbury in Fairbury, Nebraska, in the amount of $201,798.74. The Agency also acquired other building improvement funds through Fisher at Crawford State.

After the FDIC instructed Jennings State to call in the loan, the Agency and Jennings State decided to sell the bank building to Jennings State. Prior to this time, the ongoing lease arrangement between Jennings State and the Agency was reapproved by the board of directors of Jennings State. At an October 30, 1981, special shareholders' meeting, the shareholders unanimously approved the purchase of the building by Jennings State for the cost of the improvements plus a price for the original facility.

After approval by the board, Jennings asked Daniel L. Werner, an attorney, to prepare a contract for the sale of the building. Werner prepared the document, but the contract was never signed. Werner also stated that he never prepared a deed for the sale. It is Werner's testimony that Landis felt that there was no need for a formal written contract for the transaction, but Jennings wanted the sale formalized in writing. Ultimately, the contract was never signed, nor was a deed prepared. On December 3, 1981, Jennings State deposited $300,000, the agreed-upon sale price for the building plus improvements, to the Agency's account at Jennings State. At the time of transfer

of these funds, the Agency, Jennings personally, Great Plains Broadcasting, Broadcast Management, and Jim Heller, a Jennings State employee, all had outstanding notes at Citizens State. The money was used to pay off the loan at the Fairbury bank, a loan at Crawford State, and a small loan of approximately $5,500 at Citizens State.

In 1982, Fisher resigned his position and sold his interest at Crawford State. As part of the negotiations associated with Fisher's leaving Crawford State, Fisher was to personally assume loans previously made to Jennings and to the Agency. At the time, Jennings' loans totaled $127,000, and the Agency's loans $140,000. Fisher required Jennings and his wife to personally guarantee the Agency's notes. At that time the Agency had a note with Citizens State for $70,098, Great Plains Broadcasting owed Citizens State $71,000, and Broadcast Management owed $26,000. By January 1983, Jennings had personally guaranteed all these debts. Additionally, Alice Fisher, Jennings' sister, had loaned Jennings over $100,000 for a home improvement loan.

By early 1984, neither Jennings personally, the Agency, nor any of his other related business interests were able to service the notes at Citizens State or pay any amounts to the Fishers. In order to satisfy some of these debts, Jennings sold Great Plains Broadcasting. An assignment of the proceeds, prepared by Werner for the benefit of Citizens State, was drawn up between Van Cleef and Jennings for application of the proceeds of the sale to the outstanding debts at Citizens State of Jennings, the Agency, and his other related business interests. Citizens State received approximately $192,000, which was applied to service the debts of Great Plains Broadcasting and Broadcast Management but was insufficient to satisfy the Agency's debt and Jennings' personal debt. Van Cleef testified that he did not apply the proceeds to the Agency debt because he believed the Agency had assets enough to service its debt.

In 1985, Jennings and Fisher entered into negotiations for the sale of Jennings' stock in Jennings State to Fisher. The purpose of the sale was to satisfy Jennings' debt to the Fishers. The actual sale of the stock was never consummated because Fisher decided he did not want to go through with it. The

Fishers and Jennings made other arrangements for satisfaction of the debt. Jennings deeded Alice Fisher his interest in a section of land in Nuckolls County, Nebraska, to satisfy his personal debt to her, and he also pledged the stock of Broadcast Management and some stock of the Agency to Dan Fisher.

By October 1985, Jennings State was in serious financial trouble. To continue operating, the FDIC required Jennings State to inject $800,000 in capital. Because Jennings was not able to provide the necessary capital, he surrendered his stock to Jennings State, moved to Texas, and filed personal bankruptcy. Citizens State was a claimant in the bankruptcy action and, at the time of this litigation, had yet to receive any funds from the proceedings. Jennings State was recapitalized through efforts of Fisher and other investors.

At about the same time, Fisher approached Jennings and proposed that Fisher purchase the insurance portion of the Agency. The insurance business was located in the bank building. Jennings "sold" the insurance portion of the Agency to Fisher in satisfaction of the Agency's debt to Fisher. The board of directors, in a special meeting on December 28, 1985, authorized the sale of the insurance business. Additionally, Jennings transferred a post office building owned by the Agency to Fisher. It is unclear from Jennings' testimony whether this was in satisfaction of an Agency debt or a personal debt of Jennings'. There are no minutes authorizing this sale.

Following these transactions with the Fishers, the only remaining record asset of the Agency was the bank building. Jennings contends in his testimony that the Agency had no remaining assets because the building belonged to Jennings State. Jennings had no further contact with Jennings State after he surrendered his stock until Fisher contacted him in January 1986 regarding execution of a deed on behalf of the Agency for the alleged sale of the bank building in 1981.

After Jennings moved to Texas, Fisher acted as a consultant to Jennings State. He testified that he was trying to reorganize Jennings State and obtain the necessary capital required by the FDIC to keep the bank in operation. All the remaining shareholders assigned their stock back to Jennings State and then bought back their shares. Fisher assigned his interest in the

insurance portion of the Agency to Jennings State in exchange for stock. Fisher counted the value of the bank building as an asset of Jennings State for recapitalization purposes. Presumably, had the building not been included, the investors would have had to come up with $300,000 more in capital.

By the end of March 1986, Fisher had acquired all of the Agency's assets except the building, a controlling interest in and the offices of president and director of Jennings State by turning the insurance business in for stock, and a security interest in Jennings' Agency and Broadcast Management stock.

In January 1986, the Agency's note remained in default. Citizens State began to make other efforts to collect on the Agency's note. Van Cleef testified that Citizens State attached the Agency's checking account and had Citizens State's attorney, Don Sass, check the land records to determine the Agency's assets. The records indicated that the Agency was the owner of the bank building.

In February 1986, Van Cleef had a meeting with Fisher and Landis at the offices of Jennings State. Fisher informed Van Cleef at that time that he was now president of Jennings State. Van Cleef testified that he was unaware that Fisher had also acquired the majority of the Agency's assets. Fisher did not tell Van Cleef about the transfer of assets at this meeting. Van Cleef was also not aware of the alleged sale of the bank building in 1981.

The meeting was held to discuss the status of the Agency's debt with Citizens State and Van Cleef's debt with Jennings State. At the meeting Van Cleef told Fisher and Landis that he believed the Agency had assets to satisfy the debt. Fisher and Landis inquired as to what assets he was talking about, since they believed there were no assets left in the Agency. Van Cleef stated that he believed if he told them, they would try to remove the assets. Fisher and Landis told him they would not do that. When questioned about the bank building, Fisher requested that another bank employee, Dean Wight, look for the deed. Wight returned with some tax statements, but no deed. Van Cleef testified that both Fisher and Landis were surprised that no deed was found. Van Cleef also informed them at that time that he would instigate proceedings to attach the building in

satisfaction of the debt.

Van Cleef attended a second meeting with Fisher and Landis on March 6, 1986. The purpose of this meeting was further discussion of the debts of both parties. Werner was present as attorney for Jennings State, and Sass was present as attorney for Citizens State. Van Cleef informed Fisher and Landis that he had checked the records and that the Agency was the record owner of the building. Then Fisher told him about the alleged sale of the building and that the deed was missing. Van Cleef claims that there was never any discussion of trying to acquire a deed at that time. Van Cleef's debt with the Bank was settled during the meeting. That day Citizens State filed its petition asking for judgment on the Agency note. Van Cleef asserts that he became aware that Jennings State had secured and recorded a deed from Jennings when he read it in the newspaper.

Approximately 2 days before the March 6 meeting with Van Cleef, sometime after that meeting had been scheduled, Fisher contacted Werner and asked him to prepare a deed for the building, send it to Jennings for his signature, and cause it to be filed. Werner prepared a deed dated December 31, 1981. At the same time, he was representing Jennings State in the attachment proceedings by Citizens State. Jennings signed the deed on March 11, 1986. The deed was recorded in Thayer County on June 10. On July 15, judgment was entered in the district court for Thayer County in favor of Citizens State on the Agency's promissory note in default.

Testimony concerning who knew that no deed ever existed for the transfer of the building and at what time this was discovered is in conflict. Jennings testified in a confusing manner that he thought there had always been a deed, but he had never actually seen it. He could not explain why the deed was not recorded at the time of the transfer of the $300,000 purchase price to the Agency. He testified that the Agency reported the sale of the building on its 1981 tax return; that Jennings State had paid all taxes, insurance, and utilities on the building since 1981; and that Jennings State had paid no rent to the Agency since 1981.

Fisher testified that he first discovered that the building was still held in the Agency's name when he was organizing the

recapitalization of Jennings State in the fall of 1985. He testified that he discovered that the tax assessment statements for the building were still being sent to the Agency, but the taxes themselves were being paid by Jennings State. Fisher also testified that he began to search for the deed at that time. He stated that he contacted Jennings in Texas to inquire as to the whereabouts of the deed. He also instructed Jennings State's employees to "be on the look out" for the deed. However, he did not contact Werner until March 1986 to obtain a deed. This was after the first meeting with Van Cleef was held. He testified that his reason for the delay in obtaining and recording a deed for so long was that he was hoping "we would stumble across the deed."

Landis testified that he had no explanation as to why no deed was prepared for the sale in 1981. He testified that he always believed a deed had been recorded. Landis testified that he was first informed by Fisher in the fall of 1985 that no deed could be found and that Landis took no steps himself to locate the deed. He stated that the hunt for the deed was just one of many activities that were going on during the recapitalization of Jennings State, and therefore no one rushed to get a deed recorded at the time. He did not have an explanation as to why the sale contract was not signed.

In an appeal of an equity action, this court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Federal Land Bank of Omaha v. Swanson*, 231 Neb. 868, 438 N.W.2d 765 (1989). See, *Grone v. Lincoln Mut. Life Ins. Co.*, 230 Neb. 144, 430 N.W.2d 507 (1988); *Giger v. City of Omaha*, 232 Neb. 676, 442 N.W.2d 182 (1989).

Under the Uniform Fraudulent Conveyance Act, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his or her actual intent if the conveyance is made or the obligation is incurred without a fair

consideration." § 36-604.

Section 36-603 defines fair consideration as:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

There is no disagreement among the parties that $300,000 was a fair price for the bank building plus the cost of the improvements. The consideration given for the building, whether viewed in the form of a valid sale in 1981 or as an antecedent debt later satisfied by the actual transfer of the building in 1986, was adequate. Therefore, Citizens State does not satisfy the requirements of §§ 36-603 and 36-604.

Under § 36-607, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

In this case, the district court found that Citizens State failed to show by convincing evidence that Jennings State intended to defraud Citizens State in the delivery of the deed. We agree. The actual transfer of the money to the Agency and the facts that Jennings State stopped paying rent to the Agency and paid taxes and insurance on the building and that the Agency reported the sale of the building on its tax returns, all lend credence to Jennings State's claim that the late recording of the deed was merely the completion of an earlier transaction. The district court's judgment should be affirmed.

AFFIRMED.