**DUPONT CIRCLE CITIZENS ASSOCIA-TION, Petitioner,**

v.

**DISTRICT OF COLUMBIA ZONING COM-MISSION, Respondent,**

Nello Picca and Claude L. Benner, Jr., Trustees for Eurania Associates, Intervenors.

Nos. 8237 and 9159.

District of Columbia Court of Appeals.

Argued Jan. 6, 1976.

Decided by Judgment Jan. 19, 1976.

March 12, 1976.

Rehearing Denied April 26, 1976.

George F. Bason, Jr., Washington, D. C., for petitioner.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Washington, D. C., at the time the brief was filed, Louis P. Robbins, Acting Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for respondent.

Norman M. Glasgow, Washington, D. C., with whom Whayne S. Quin and John F. McCabe, Jr., Washington, D. C., were on the brief, for intervenors.

Before REILLY, Chief Judge, and YEAGLEY and MACK, Associate Judges.

YEAGLEY, Associate Judge:

These consolidated appeals are from two orders of the Zoning Commission based upon a preliminary and a final application for approval of a Planned Unit Development (P.U.D.) under Article 75 of the Zoning Regulations. They were resolved by a judgment that issued January 19, 1976, affirming the two orders of the Commission stating that an opinion would be filed at a later date.

The applications for the P.U.D. were filed by property owners in Square 115, a triangular plot consisting of over 66,000 square feet in northwest Washington bounded by Dupont Circle, 19th Street, Sunderland Place and New Hampshire Avenue. The properties involved in the proposal are the Euram Building on Dupont Circle, owned by the Euram Corporation, the Christian Heurich Memorial Mansion at the corner of New Hampshire Avenue and Sunderland Place, owned and occupied by the Columbia Historical Society, the Sunderland Building at the corner of Sunderland Place and 19th Street, owned by Arthur H. Keyes, and a parking lot in the

midst of those buildings formerly owned by Dupont Circle Joint Venture, the original intervenor herein.[1] The Euram Building was zoned C-3-B (see D.C. Zoning Regs. § 5103) with the balance of the area zoned SP (see D.C. Zoning Regs. § 4101).

The purpose of the Planned Unit Development provision as set forth in § 7501.1 of the D.C. Zoning Regulations is

. . . to encourage . . . in keeping with the intent and purpose of each [zoning] district, the development of well-planned residential, institutional and commercial developments, industrial parks, urban renewal projects or a combination thereof, which will offer a variety of building types with more attractive and efficient overall planning and design without sacrificing creative and imaginative planning.

Intervenor submits that the two applications are in compliance with the provisions of Article 75 of the Zoning Regulations. The proposed P.U.D. encompasses the existing buildings in Square 115 and a new 12-story office building to be constructed on the parking lot, with allotted retail use on the first floor and part of the next floor below. Approval of the plan would entail the rezoning of the SP area to C-3-B. The floor area ratio (F.A.R.) requirement of the Zoning Regulations would be met by the sale and transfer of development rights from the Columbia Historical Society to the intervenor.[2] As a result the total density of the P.U.D. would be less than the maximum permitted in a C-3-B zone. The Columbia Historical Society was to be made more financially secure by the substantial amount of money to be paid it for its development rights thereby assuring its continued operation. The Heurich Mansion, its garden and open spaces were

1. As a result of a transfer of title, Nello Picca and Claude L. Benner, Jr., trustees for Eurania Associates, have been substituted as intervenors.

2. Under a C-3-B zoning the Historical Society would have an unused development po-

tential of 97,175 square feet. The final order approved the sale and transfer of 82,000 square feet for the new building making the effective F.A.R. of the proposed building 8.9 and the overall F.A.R. of the site 6.5.

to be preserved. Further openness was to be attained through the use of pedestrian arcades, one of which would facilitate access from New Hampshire Avenue to the new Metro station directly across from the project on 19th Street.

At the hearing on the preliminary application, reports were received from the Zoning Advisory Council, the National Capitol Planning Commission, the Joint Committee on Landmarks of the National Capitol, and the National Trust for Historic Preservation as well as from the Zoning Commission's Staff. Each of these groups recommended approval of the application, but several conditions were proposed.

After two public hearings the preliminary application was approved with minor modifications and with most of the conditions recommended by the referral agencies. The original intervenor thereupon filed its final application. After a comprehensive public hearing, the Commission approved the application without substantial change from its earlier order. Those two orders are the subject of this appeal.

Petitioner's numerous assignments of errors on the final order may be stated briefly as relating to an asserted inadequate notice to it of the second hearing, the deprivation of the right to present evidence and to cross-examine witnesses, insufficient evidence to support several of the Commission's findings, a misapplication of the Planned Unit Development concept and an abuse or stretching of the Commission's authority in permitting the transfer of development rights and using zoning to promote historical preservation. Finding no merit in these, or the other contentions of petitioner, we affirm.

■ Petitioner asserts that the notice of the nature and extent of the hearing on the final application did not comply with the Commission's own rules or with the Administrative Procedure Act (*see* D.C. Code 1973, § 1–1501 *et seq.*) and that it was thereby deprived of due process of law. The basis of this claim is that the notice did not specify that the final hearing would include the presentation of additional evidence relating to issues that had already been aired at the preliminary stage and that since petitioner's counsel, being under that misapprehension, walked out of the latter hearing it was thereby denied the right to present evidence, to cross-examine, and to file exceptions and present argument concerning the proposed order.

An examination of Zoning Commission Regulation No. 7501.31 regarding the preliminary application and Regulation 7501.39 regarding the final application reveals clearly that it was not intended, nor would it be feasible, to conduct an adequate hearing on the final application without treating, in at least some detail, matters heard on the preliminary application.

Regulation 7501.39 requires in substantial part that the final application shall include the following information: The proposed use, location, dimensions and approximate height of each building, the approximate area and dimension of each lot, the approximate lot occupancy of each building and the approximate floor area ratio of each building, the number and location of all off-street parking spaces, the existing topography of the area and the elevations of the streets and alleys bounding the site, the location of public and private rights of way and easements and the location and approximate number, size and type of stores, offices, residential units and commercial adjuncts together with all maps and documents required for an amendment to these regulations. There is no room for doubt that the hearing on such an application would be detailed and comprehensive. Many of the foregoing matters were, of course, dealt with at the preliminary hearing. It would be both illogical and impractical to conclude that the Commission was precluded from reexamining at the final hearing matters that had been dealt with on the preliminary application, nor is

there any regulation suggesting such a limitation.

■ Petitioner asserted in its brief on the appeal of the decision approving the preliminary application as set forth in Zoning Commission Order No. 81 that the order was defective in that the Commission's findings of fact and conclusions of law were insufficient as a matter of law. We do not reach that issue since we conclude that the findings of fact and conclusions of law in the final P.U.D. decision (Zoning Commission Order No. 101) are legally adequate and sufficient to support the order approving the application. As long as the petitioner was accorded a due process type hearing whatever deficiencies of the foregoing nature that may have occurred in the preliminary decision were remedied by the final order. The entire record of the preliminary P.U.D. application was incorporated into that of the final application. As the Commission was not precluded from reexamining at the final hearing matters dealt with on the preliminary application, the final order must necessarily control if there is any inconsistency on the merits with the order on the preliminary application.[3]

Two days before the hearing on the final application was to commence the petitioner filed a motion to postpone the hearing pending the decision of this court on the appeal of the Commission's decision on the preliminary application. The motion was denied. At the outset of the final hearing counsel for petitioner formally withdrew from participation in that hearing and walked out. On that occasion he said:

Mr. Addams: I have a preliminary matter. I note that you have denied the

motion [filed by Dupont Circle Citizens Association to continue the hearing indefinitely] without argument or rebuttal. I will state for the record that the Dupont Circle Citizens Association will not participate in a hearing on the formalities of a design of how many or what color of stone you are putting on and how big the windows are going to be. We will not participate in a hearing on the design of a building which we feel under the law should not be constructed in the first place.

I would ask the Chairman for guidance at this point, whether it is appropriate to ask for a stay of construction pending the decision of the D.C. Court of Appeals before this body now or should that be done in written form at some subsequent time.

\* \* \* \* \* \*

Mr. Chairman: Mr. Addams, I hope you will recognize that this is done with sincerity rather than any attempt at facetiousness. The fact of the matter is that, first of all, it is true that [applicant's counsel] has made that point in his opposition, and the Commission took that point among others into consideration. *But we are not in a position to advise counsel as to how to proceed, under the circumstances.* [Emphasis added.]

■ Petitioner received due notice of the final hearing and its counsel was present when the hearing opened. We conclude that the Commission did not err in proceeding with the hearing and in taking evidence which may have, in substantial part, related to matters considered on the preliminary application. Further, petitioner's counsel having voluntarily with-

---

3. This is not inconsistent with our opinion in *Capitol Hill Restoration Society v. Zoning Commission,* D.C.App., 287 A.2d 101 (1972), where we observed at 106 that "defects in the original hearing could not be cured by later proceedings or administrative

appeals." That statement related to the sufficiency or legality of the procedures accorded the parties and not to the question of whether on the merits the Board can after the final hearing enter an order that may in some respects differ from or modify the earlier order.

drawn from participation in the hearing, whether with or without actual knowledge of what evidence was to be adduced[4] is in no position now to complain of the scope of that hearing. We can give no serious recognition to the incredulous contention that intervenor's loss of the right to present evidence, to cross-examine witnesses and to make argument was in contravention of the Zoning Rules, the D.C. Administrative Procedure Act, and the due process clause of the Constitution. It was simply the natural and logical consequence of its counsel voluntarily declining to participate.

■ Similarly petitioner's complaint that the Commission should have filed proposed findings necessarily fails. Rule 2.622 only requires service of proposed findings on "any party who appeared and participated in the hearing . . ." The petitioner's only designated representative for the hearings, its counsel, was not present and did not participate. Neither of the two members of the petitioner organization (one of whom, a Miss McCarron, was on its executive board) who were present had entered an appearance as a representative of petitioner and there was no showing that either one had authority to act or to speak for it. The petitioner's only duly authorized attorney before the Commission had announced a determination not to participate and absented himself from the final hearing. Further, a reading of the section immediately preceding § 2.622 and the section immediately following it would indicate that the rule was designed to apply to a hearing conducted by a hearing officer, not to a hearing before the Commission.

■ Petitioner complains that the Commission failed to comply with rule 2.623 regarding service of proposed findings and conclusions on each party. That rule is inapposite to this situation and was designed only to apply to hearings "wherein a majority of the Commissioners did not personally hear the evidence." A majority of three Commissioners heard all of the evidence at the hearing on the final application. All three participated and voted at the meeting when unanimous approval of all five Commissioners was given the application. The fact that only two of those three and one of the other Commissioners signed the findings of fact and conclusions is irrelevant to rule 2.623.[5]

■ In a similar vein, petitioner also asserts that the failure of the intervenor to serve it with a copy of intervenor's proposed findings and conclusions denied it rights under § 1.6 of Title 20 DCRR as well as rights of due process. Section 1.61 provides that "[a]ny paper *required to be served upon a party* shall be served upon him . . . ." [Emphasis supplied.] However, we are unable to find anything in Title 20 of the D.C. Rules and Regulations requiring the proposed findings to be served upon other parties. Section 2.56 which deals with proposed findings states that "[p]arties . . . shall submit proposed findings of fact and conclusions of law *for the consideration of the Commission* . . . ." [Emphasis supplied.] The drafters of Title 20 clearly expressed

---

4. Section 2.4 of the Zoning Rules of Practice and Procedure (Title 20 DCRR) requires the applicant to file ten days before the hearing is advertised, among other things, a list of witnesses, maps, plans and other documents to be offered at the hearing. In the instant case they were filed on August 15, a week before the hearing was advertised on August 23, and a full month and a half before the hearing was held on October 2, together with an outline of what each witness would testify about. Petitioner is presumed to have known

of that requirement, although the rules do not require that these papers be served on other parties since the other parties are not determined until 5 days prior to the hearing. (*See* 20 DCRR § 2.44.)

5. For the same reasons there was no breach of D.C.Code 1973, § 1–1509(d) as contended by petitioner since a majority of those who were to render the final order personally heard the evidence.

their intention that the proposed findings be submitted to the Commission but did not provide for them to be served on other parties. This is consistent with the failure of the Commission to provide by rule for a party to file objections or exceptions to the proposed findings of the opposing party. We know of no authority supporting petitioner's contention that the failure of intervenor to serve it with proposed findings denied it due process of law. Such a position is particularly untenable when raised by a party that announced its refusal to participate at the inception of the hearing.

■ Petitioner also asserts that it was denied the right to cross-examine witnesses when, in the absence of its counsel the Commission refused the request of Miss McCarron, a member of its executive board and a nearby property owner, to cross-examine a witness of the applicant. As we have observed, however, Miss McCarron had not entered an appearance and therefore did not have a personal right to cross-examination as would a party to the proceedings. Neither was there any foundation laid for her to act as counsel or to speak on behalf of the Dupont Circle Citizens Association. Since that party's only counsel of record had announced its decision not to participate the Commission certainly had no authority to permit a single member of the executive board to overrule that decision and it properly denied the request.

■ It is further contended by petitioner that the Zoning Act and Regulations do not permit the Commission to approve a transfer of development rights within a P. U.D. As petitioner provides us with no legal support for its position, we turn to an examination of the Act which grants the Commission a broad general authority in the following language:

> To promote the health, safety, morals, convenience, order, prosperity, or general welfare of the District of Columbia and its planning and orderly development as the national capital, the Zoning Commission created by section 5–412, is hereby empowered, in accordance with the conditions and procedures specified in sections 5–413 to 5–428, to regulate the location, height, bulk, number of stories and size of buildings and other structures, the percentage of lot which may be occupied, the sizes of yards, courts, and other open spaces, the density of population, and the uses of buildings, structures, and land for trade, industry, residence, recreation, public activities, or other purposes . . . . [§ 5–413.]

The Act further provides in the next section:

> Such regulations shall be . . . designed to lessen congestion in the street, to secure safety from fire, panic, and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the undue concentration of population and the overcrowding of land, and to promote such distribution of population and of the uses of land as would tend to create conditions favorable to health, safety, transportation, prosperity, protection of property, civic activity, and recreational, educational, and cultural opportunities . . . [§ 5–414.]

This grant of authority is not materially unlike the first three sections of the Standard State Zoning Enabling Act, drafted and distributed by the United States Department of Commerce in the early 1920's.[6] It represents a broad grant of authority with an itemization of the main purposes of zoning.

■ We turn now to a consideration of petitioner's claim that the Zoning *Regulations* do not provide for the transfer of development rights. The very nature of the Planned Unit Development concept as promulgated by the Zoning Commission in Ar-

6. *See* 4 R. Anderson, American Law of Zoning § 26.01 (1968); 1 *id.* §§ 3.11–3.14.

ticle 75 of the Regulations suggests that a transfer of development rights from one building to another must have been contemplated as one that was both feasible and appropriate in the development of such a plan. Regulation 7501.39 provides that the lots within a P.U.D. may be of different sizes, the buildings of different heights and that the lot occupancy of the building may vary on each lot. It is not surprising then that the Commission provided in 7501.24b that "[t]he floor area of all buildings shall not exceed the *aggregate* of the floor area ratios as permitted in the several districts included within the project area . . . ." [Emphasis supplied.] This is consistent with, and we take it to be an official recognition of, the utility of the development rights concept to a P.U.D. On the other hand, there is no provision in P.U.D. regulations that the floor area ratio of each building in the P.U.D. must be within the maximum permitted in the district. The requirement to be met is that the F.A.R. for all buildings does not exceed the "aggregate" permitted within the project area. The Commission has found that the proposed project meets that requirement and we know of no good reason why, in making that determination, it may not take into consideration a mutually agreed upon transfer of development rights. We also hold that where the total F.A.R. for the project is the determinative figure, rather than the F.A.R. for each building, there is no impediment to permitting payment for the transfer of such rights from one building owner to another within the same project when agreed to by the parties.

■ Petitioner also questions the Commission's use of zoning to accomplish historical preservation contending that it is unauthorized by the Code. It does not deny that Congress has passed a number of statutes supporting historical preservation, but contends that since Congress has not specifically authorized it in the Zoning Act

the Commission is without authority to use zoning for that purpose. We cannot agree. The quotation, *supra*, from the Zoning Act authorizes the Commission among other things to conduct zoning so as to promote the "general welfare of the District of Coumbia and its planning and orderly development as the national capital." (D.C.Code 1973, § 5–413.)

In the case of *Rebman v. City of Springfield*, 111 Ill.App.2d 430, 250 N.E.2d 282 (1969), an Illinois appellate court observed that "preservation of historical areas under reasonable limitations as to use is within the concept of public welfare and may be effected by the exercise of the usual police power attendant upon zoning." 250 N.E.2d at 288.

During the past one hundred years, at least, there has been considerable thrust behind the movement for historical preservation as demonstrated by the activities of private organizations and of the federal and state governments. Every state, the federal government, and over 40 municipalities have enacted varous forms of historic preservation laws.[7]

When the Congress enacted the Historic Sites, Buildings and Antiquities Act of 1935 it declared that "it is a national policy to preserve for public use historic sites, buildings, and objects of national significance for the inspiration and benefit of the people of the United States." 16 U.S.C. § 461 (1970). That objective was restated and given further implementation by the Historic Properties Preservation Act of 1966, Pub.L. No. 89–665, 80 Stat. 915, wherein Congress found and declared:

. . . . . .

(b) that the historical and cultural foundations of the Nation should be preserved . . .

. . . . . .

(d) that, although the major burdens of historic preservation have been borne

7. *The Police Power, Eminent Domain, and the Preservation of Historic Property,* 63 Colum.L.Rev. 708 (1963).

. . . by private agencies and individuals, . . . it is nevertheless necessary and appropriate for the Federal Government to accelerate its historic preservation programs and activities . . . and to assist State and local governments . . . to expand and accelerate their historic preservation programs and activities. [ 16 U.S.C. § 470 (1970).]

The National Trust for Historic Preservation, established by Congress to lead the historic preservation movement (16 U.S.C. § 468 (1970) ) requested, by letter to the Zoning Commission of April 20, 1973, permission to appear and testify in support of the preliminary application. In its letter the Trust stated: "The proposed zoning change will result in the transfer of the unused development rights over an historic building (the Heurich Mansion) to land adjacent to the site of the historic building. Such a technique can result in historic buildings being saved where economic pressures ordinarily would result in their demolition." The National Capital Planning Commission in a letter of May 31, 1972, to the Zoning Commission stated in reference to conditions it was imposing that "[t]he interest of the Commission is the preservation of the Heurich Mansion . . . . ."

In its final report the Zoning Advisory Council in recommending approval of the application said: "The preservation and upkeep of a category II Landmark (the Heurich Mansion) on the National Register of Historic Places is in the best interests of the District of Columbia."

The general Congressional intent to preserve places and areas of historic interest was made mandatory by Congress as to zoning in the district of "Old Georgetown" when Congress provided: "In order to promote the general welfare and to preserve and protect the places and areas of historic interest, exterior architectural fea-

tures and examples of the type of architecture used in the National Capital in its initial years" the Commission shall solicit a report from the National Commission on Fine Arts before issuing a building permit in the Georgetown district. D.C.Code 1973, § 5–802.

In that law the Congress observed that this was being done "to promote the general welfare." *Id.* It would be in derogation of the Congressional intent so clearly expressed to hold that although the Zoning Commission is under a mandate to consider matters of historic preservation in a particular district that it is without authority even to give consideration to that factor when the property is located in another area. The instant P.U.D. is located less than four blocks from the "Old Georgetown" district. We conclude that the Commission was acting in the interests of "the general welfare" and within its authority when it gave consideration to historical preservation in weighing the transfer and sale of development rights and the merits of the P.U.D.

■ Petitioner further alleges that the regulations contained in Article 75 of the D.C. Zoning Regulations dealing with Planned Unit Developments violate the uniformity provisions of § 5–413 of the D.C. Zoning Act.[8] It asserts that this section of the Act imposes a requirement of uniformity within each zoning district which is not met by the P.U.D. regulations which permit "diversification in the use, size, type and location of buildings" and that consequently the regulations do not conform to the Zoning Act. We fail to discern that the regulations run contrary to the Act in the manner described by petitioner.

We have found no authority, and petitioner refers us to none, supporting its

8. The uniformity provision of the Zoning Act (D.C.Code 1973, § 5–413) provides:
All such regulations shall be uniform for each class or kind of building throughout each district, but the regulations in one district may differ from those in other districts.

proposition. The interpretation of the uniformity requirement of the Zoning Act is of first impression in the District of Columbia. Other courts which have dealt with the matter have uniformly found that P.U.D. and P.U.D.-type regulations do not violate uniformity requirements. The California Court of Appeal was faced with a uniformity provision virtually identical to ours in *Orinda Homeowners Committee v. Board of Supervisors*, 11 Cal.App.3d 768, 90 Cal.Rptr. 88 (1st Dist. 1970). In that case the court held that the uniformity provision

> provides that the *regulations* shall be uniform for each class or kind of building or use of land throughout the zone. It does not state that the units must be alike even as to their character . . . .. In conventional zoning, where apartment houses are permitted in a particular zone, single family dwellings, being regarded (whether rightly or wrongly) as a "higher" use, are also allowed. This causes no conflict with [the uniformity provision]. [90 Cal.Rptr. at 90–91.]

Thus according to the California court Planned Unit Developments do not violate such a provision.

> That court went on to examine the history of the uniformity provision noting that it was derived from Section 2 of the Standard State Zoning Enabling Act and

> it is said in 1 Anderson, American Law of Zoning, § 5.17, p. 288, that the purpose of [that] section was mainly a political rather than a legal one, namely, to give notice to property owners that there shall be no improper discriminations. This was useful in the early days of zoning. Professor Anderson suggests that

the fact that the section is an expression of policy may be the reason for the scarcity of judicial construction of the uniformity requirement. [90 Cal.Rptr. at 91.]

The Supreme Court of Pennsylvania, in upholding an amendment to the zoning map so as to permit the locating of a P.U.D. in a low density residential district held "that the board, within its sound discretion, could have concluded that council passed the ordinances with the proper overall considerations in mind. The P.U.D. district established by ordinance 160 is not the type of use which by its very nature could have no place in the middle of a predominantly residential borough." Included in the new district were single family attached, or detached dwellings, apartments, parks, a municipal building, a school, art galleries, professional offices, motels, etc.[9]

We find the reasoning in those two cases to be persuasive and hold that Article 75 of the D.C. Zoning Regulations does not violate D.C.Code 1973, § 5–413 and was not beyond the authority of the Commission. The Act requires only that the regulations be applied uniformly to all property throughout a district, all owners of the same class being treated alike. The uniformity provision does not prohibit a classification which is reasonable. 1 R. Anderson, *supra* at § 3.13 and § 5.17.

Petitioner asserts, however, that even if this be true, that the option of utilizing the benefits and flexibilities of the Article 75 regulations are not open on the same basis to all property owners and thus there is created an "individious discrimination based on wealth, in violation of the equal protection and due process clauses" of the Constitution.[10]

9. *Cheney v. Village 2 at New Hope, Inc.*, 429 Pa. 626, 241 A.2d 81, 84–85 (1968).

10. As we have stated on many occasions, most recently in *Kelly v. United States*, D.C. App., 348 A.2d 884 (1975), the 14th Amendment (and hence the equal protection clause) does not apply to the District of Columbia. However, equal protection and due process are not mutually exclusive terms and, as the Supreme Court has said, many of the concepts in the equal protection clause are applicable to the District through the due process clause of the Fifth Amendment. *Bolling*

We find this essentially to be a frivolous argument. Nowhere in Article 75 of the Zoning Regulations is there any provision which would indicate that the option to develop Planned Unit Developments is not open to all property owners within the respective zoning districts. Naturally, this does not guarantee that all owners will be able to achieve the same flexibility of development regardless of the type and location of the property they own. The nature of development on different parcels of land depends on the location and character of the property and the character and quality of the proposed development and is for the Zoning Commission not this court to decide.

Petitioner asserts that "only large landowners and developers can take advantage of the P.U.D. regulation, because only large, one-acre-or-more tracts are eligible . . . ." That this argument is specious can be seen from an examination of the fact situation of the instant case. Here four property owners came together to put forth a P.U.D. proposal. None could have done so by itself since none owned an "acre or more". There is nothing to prevent any number of owners from doing exactly what was done here, other factors being equal. Indeed, the P.U.D. regulations seem designed to achieve just such a result.

Petitioner's claim that the due process clause is violated by Article 75 since its implementation "requires involved, time-consuming and necessarily expensive administrative procedures requiring extensive services of attorneys, architects and planners", rests on no stronger footing. Such assertions might be made against many zoning regulations whether they concern a complicated Planned Unit Development, a map change, a street closing or a mere zoning variance.

■ A zoning ordinance is presumed valid and the burden of proof rests upon the litigant who asserts its unconstitutionality. 1 R. Anderson, American Law of Zoning § 2.15 n. 6 (1968). The determinative issue is whether the ordinance is a reasonable exercise of the police power. *Id.* § 2.19. Petitioner here has not demonstrated unreasonableness in the ordinance. Considering the benefit to the neighborhood as found by the Commission, we find the application of Article 75 to be a reasonable exercise of the Commission's authority. For a more detailed discussion of the problem supporting this result *see* Annot., 43 A.L.R.3d 888 (1972).

■ As to the assignments of error directed at those portions of the findings and conclusions that bear upon the merits of the application we first observe that our function is not to determine whether a particular zoning action is, or is not desirable.[11] Rather it is to determine whether there were any errors of law in the proceedings, whether the findings and conclusions were arbitrary, capricious or an abuse of discretion, or not supported by substantial evidence.[12]

The Zoning Commission sought guidance from the many government agencies concerned with the enterprise and the area, each of which urged approval of the P.U.D. Opposing witnesses and parties were given ample opportunity to be heard.

■ We have examined the record and conclude that there was substantial evidence to support the decision of the Commission. The Commission is the authority charged by Congress with interpreting and

v. *Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *See also Washington v. United States,* 130 U.S.App.D.C. 374, 401 F.2d 915 (1968).

11. *Berman v. Parker,* 348 U.S. 26, 33, 75 S. Ct. 98, 99 L.Ed. 27 (1954).

12. D.C.Code 1973, § 1–1510. *See also* D.C. Code 1973, § 17–305(b).

enforcing the zoning laws and regulations of the District of Columbia. As long as its proceedings were according to law, its decisions will carry a presumption of regularity on appeal and this court will not weigh the evidence and substitute its judgment for that of the Commission.[13]

Finding the other contentions of petitioner to be without merit, the orders appealed from are

*Affirmed.*

---

13. *Brawner Building, Inc. v. Shehyn*, 143 U.S.App.D.C. 125, 130, 442 F.2d 847, 852 (1971) ; *Salyer v. McLaughlin*, 100 U.S. App.D.C. 29, 31, 240 F.2d 891, 893 (1957) ; *Lewis v. District of Columbia*, 89 U.S.App. D.C. 72, 74, 190 F.2d 25, 27 (1951) ; 3 R. Anderson, American Law of Zoning § 21.16 (1968).