828 A.2d 317

RUMSON ESTATES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MAYOR & COUNCIL OF THE BOROUGH OF FAIR HAVEN, DEFENDANT–RESPONDENT, AND FAIR HAVEN PLANNING BOARD, DEFENDANT.

FERRARO BUILDERS, LLC AND RAND ASSOCIATES, A NEW JERSEY PARTNERSHIP, PLAINTIFFS–APPELLANTS, v. BOROUGH OF ATLANTIC HIGHLANDS PLANNING BOARD AND BOROUGH OF ATLANTIC HIGHLANDS, DEFENDANTS–RESPONDENTS.

Argued February 20, 2003—Decided August 5, 2003.

340

*Theodore D. Parsons, Jr.*, argued the cause for appellant Rumson Estates, Inc. (*Parsons & Nardelli*, attorneys).

*Martin A. McGann, Jr.*, argued the cause for appellants Ferraro Builders, LLC and Rand Associates (*Mr. McGann*, attorney; *Mr. McGann* and *Marc A. Leckstein*, on the briefs).

*Bernard M. Reilly*, argued the cause for respondents Mayor & Council of the Borough of Fair Haven and Borough of Atlantic Highlands (*Dowd & Reilly*, attorneys).

*Michael B. Steib*, argued the cause for respondent Borough of Atlantic Highlands Planning Board.

*Wayne J. Peck*, submitted a brief on behalf of *amicus curiae*, New Jersey Builders Association in Rumson Estates, Inc. v. Mayor & Council of the Borough of Fair Haven.

The opinion of the Court was delivered by

LONG, J.

Two basic issues are presented by these appeals.[1] The first is whether a municipality may enact a zoning ordinance that alters the definitions in the Municipal Land Use Law (MLUL). *N.J.S.A.* 40:55D–1 to –136. The second is whether zoning regulations may make provision for different conditions within a zone without violating the uniformity principle of *N.J.S.A.* 40:55D–62a. We hold that, with a narrow exception, the MLUL does not preclude a municipality from adopting a zoning ordinance that defines terms differently from the definitions in the MLUL. We also hold that the notion of uniformity does not prohibit classifications within a district so long as they are reasonable and so long as all similarly situated property receives the same treatment.

I

A.

*Rumson Estates v. Mayor & Council of Borough of Fair Haven*

Fair Haven is a fully developed municipality of approximately one square mile. Its population of 6,000 is basically dispersed among single lot construction and small subdivisions. In 1999, as part of a comprehensive revision of its Development Regulations, Fair Haven changed the zoning of the William Street block from R–7.5 (requiring sixty feet of frontage and a minimum lot area of 7,500 square feet) to R–5 (requiring fifty feet of frontage and a minimum lot area of 5,000 square feet). It included a maximum floor area ratio of .40. Such a ratio essentially limits habitable floor area to a percentage of the total lot. The ordinance also capped the floor area at 2,200 square feet for all single-family dwellings in the district. Under the ordinance, the smaller of the floor area ratio or the cap applies.

---

[1] We have consolidated these cases for the purpose of this opinion.

Plaintiff, Rumson Estates, Inc., is the owner of an approximately 27,000 square foot parcel of property in Fair Haven that it proposed to subdivide into three lots of fairly equal size. Each lot was to have fifty feet of frontage, a depth of 181.5 feet and a total area of 9,066.4 square feet. Applying the floor area ratio only, plaintiff would have been able to build a house of approximately 3,600 square feet on each lot. However, the cap limited plaintiff to 2,200 square feet.

After the Fair Haven Planning Board denied the application for a subdivision and a variance to exceed the cap, plaintiff filed a Complaint in Lieu of Prerogative Writs claiming, among other things, that the cap was *ultra vires* because it altered the MLUL definition of "lot" and thus skewed the MLUL definition of "floor area ratio." The gist of that argument was that the cap interfered with the relationship between floor area and total land area, which is at the heart of the MLUL definition of floor area ratio.

While the matter was pending in the Law Division, plaintiff refiled its subdivision application without the floor area variance request, and the Fair Haven Planning Board granted approval subject to the cap. Thereafter, plaintiff moved for summary judgment, citing the Appellate Division decision in *Manalapan Builders Alliance, Inc. v. Township Comm. of Manalapan,* 256 *N.J.Super.* 295, 606 *A.*2d 1132 (1992), for the proposition that the cap was *ultra vires* because it violated the definition of floor area ratio in the MLUL. The trial court denied the motion, concluding that Fair Haven's purpose in enacting the cap, which was to diversify the town's residential housing stock by allowing for smaller, more affordable construction, was a legitimate one, and that plaintiff did not defeat the presumption in favor of the cap's validity.

Plaintiff appealed. Before the Appellate Division, plaintiff reiterated its argument that the cap violated the floor area ratio definition in the MLUL and was *ultra vires*. The Appellate Division disagreed. In a ruling penned by Judge Carchman, the court began its analysis with the presumption of validity of the

zoning ordinance and the absence of a provision restricting Fair Haven from enacting a cap. *Rumson Estates, Inc. v. Mayor & Council of Fair Haven,* 350 *N.J.Super.* 324, 331–32, 795 *A.*2d 290 (App.Div.2002). Proceeding, the court observed that Fair Haven's putative purposes in enacting the ordinance were the legitimate goals of ensuring the proportionality of new construction to other homes in the zone and providing affordable housing in a municipality with limited area and housing stock. *Id.* at 329, 795 *A.*2d 290. The court upheld the cap as an exercise of the municipality's authority to regulate the size of structures, by using, in addition to floor area ratios, "other ratios and regulatory techniques." *Id.* at 331–32, 795 *A.*2d 290. In so doing, the court distinguished *Manalapan Builders* because the cap did not violate a definition in the MLUL. *Id.* at 330, 795 *A.*2d 290. The dissenting judge, Judge Wells, concluded that if redefining the formula for floor area ratio to achieve the salutary goal of protecting environmentally sensitive land is *ultra vires* under *Manalapan Builders,* then it is also impermissible to "manipulate" the definition by use of a cap. *Id.* at 334, 795 *A.*2d 290 (Wells, J., dissenting).

The matter is before us as of right because of the dissent in the Appellate Division. *R.* 2:2–1(2). We accorded *amicus* status to the New Jersey Builders Association.

### B.

### *Rand Associates & Ferraro Builders*

Rand Associates is the titleholder and Ferraro Builders the contract purchaser of property in the R–2 zone of Atlantic Highlands with respect to which the Planning Board granted a three-lot subdivision. Each lot exceeded what was then the R–2 zone minimum lot size of 15,000 square feet.[2]

---

[2] In 2003, the zoning ordinance was amended to create an R–3 zone with a 30,000 square foot minimum lot size. Incorporated within that zone is most of the steep-slope area of Atlantic Highlands.

After subdivision approval, the governing body of Atlantic High-
lands adopted a steep slope ordinance. The precipitating event
for the enactment of that ordinance was a landslide that blocked a
roadway and inhibited not only general ingress and egress to the
area but barred access to emergency vehicles. According to the
municipality, the purpose of the ordinance was to avoid such
occurrences by diminishing soil disturbance on the slope and
preventing "slump blocking." [3]

The steep slope ordinance is extensive. Only a few of the
portions are directly relevant. Article 7.33E provides that "in
areas of slopes greater than 15% the applicable provisions of the
Zoning Chapter relating to minimum lot sizes and density of
development, and maximum percentage of lot coverage shall be
modified, and limitations of maximum impervious surfaces and
maximum lot disturbance shall be added." Atlantic Highlands,
N.J., Development Regulations art. 7.33E. The ordinance goes on
to adjust the basic provisions of the zoning ordinance by prescrib-
ing that the total land area of a parcel in the steep slope zone will
be multiplied by a graduated slope factor to reach minimum lot
size, *id.* at art. 7.33E.1, maximum lot coverage, *id.* at art. 7.33E.2,
and maximum impervious surface area, *id.* at art. 7.33E.3. Maxi-
mum lot disturbance, in turn, is based on those modified figures.
*Id.* at art. 7.33E.4.

After the adoption of the steep slope ordinance, plaintiffs built
houses on two of their lots. However, when the slope factors were
applied, the proposed structure on the third lot—a two story
single-family house with a 1,600 square foot footprint on a 23,097
square foot lot—exceeded the maximum lot disturbance. Plain-
tiffs applied for a slope area permit, which was denied. They then
appealed to the Planning Board, which held that plaintiffs had

---

[3] According to Atlantic Highlands, slump blocking occurs when water pen-
etrating the ground vertically reaches a soil strata of different density, causing
the water to then run horizontally, thereby saturating the horizontal soil layer to
the point that the soil is liquefied, causing a large surface layer, up to an acre or
more, to move in a rotational fashion laterally down a sloped area.

failed to prove that the permit request was denied improperly, arbitrarily or capriciously.

Subsequently, plaintiffs filed a Complaint in Lieu of Prerogative Writs raising a number of issues, one of which was that under *Manalapan Builders*, the "steep slope" ordinance was facially invalid, because it changed certain definitions in the MLUL. They also contended that the zoning ordinance violated the uniformity requirement of the MLUL by applying a different standard to sloped areas than was applicable to flat areas within the zone. The trial court applied a deferential standard to the ordinance and upheld it.[4]

Plaintiffs appealed and the Appellate Division, without opinion, affirmed the validity of the ordinance. Neither the trial court nor the Appellate Division addressed the issue of whether the MLUL authorized the steep slope ordinance, nor did those courts consider *Manalapan Builders*, which plaintiffs argue is critical to the resolution of this case. We granted certification. 175 *N.J.* 170, 814 *A.*2d 635 (2002).

II

Reduced to their essence, the arguments advanced by plaintiffs and the *amicus* are as follows: the ordinances in question violate the definitions in the MLUL and are *ultra vires* under *Manalapan Builders* and, even if not *ultra vires*, the ordinances thwart the notion of "uniformity in the zone" and thus confound a fundamental goal of the MLUL.

Defendants counter that the presumption of validity of a zoning ordinance, coupled with the municipal governing body's broad discretion in the field, requires the MLUL to be read in harmony with the ordinance; that nothing in the MLUL bars a municipality

---

[4] Among the other issues addressed by the trial court were statute of limitations; entire controversy; preemption; inverse condemnation; and the arbitrariness of the denial of the permit. None of those issues were raised in the petition for certification and they are, therefore, not before us.

from developing its own ordinance definitions; that the MLUL specifically permits a municipality to utilize, in addition to floor area ratio, other "ratios and regulatory techniques" to regulate the intensity of land use; and that uniformity does not require a monolithic approach to all property within a zone.

## III

Municipalities do not possess the inherent right to zone. *Riggs v. Township of Long Beach*, 109 *N.J.* 601, 610, 538 *A.*2d 808 (1988). Zoning is a police power that is vested in the legislative branch of government. *Ibid.* That branch, in turn, is authorized to delegate to municipalities the power to adopt zoning ordinances. *N.J. Const.* art. 4, § 6, ¶ 2; *Taxpayer Ass'n of Weymouth Township v. Weymouth Township*, 80 *N.J.* 6, 20, 364 *A.*2d 1016 (1976), *appeal dismissed and cert. denied sub nom., Feldman v. Weymouth Township*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L. Ed.*2d 373 (1977). In 1976, the Legislature effectuated such a delegation by enacting the MLUL, *N.J.S.A.* 40:55D–1 to –136, a comprehensive statute that allows municipalities to adopt ordinances to regulate land development "in a manner which will promote the public health, safety, morals and general welfare" using uniform and efficient procedures. *Levin v. Township of Parsippany–Troy Hills*, 82 *N.J.* 174, 178–79, 411 *A.*2d 704 (1980).

*N.J.S.A.* 40:55D–2 sets forth the goals underlying the MLUL:

a. To encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare;

b. To secure safety from fire, flood, panic and other natural and man-made disasters;

c. To provide adequate light, air and open space;

d. To ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole;

e. To promote the establishment of appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods, communities and regions and preservation of the environment;

f. To encourage the appropriate and efficient expenditure of public funds by the coordination of public development with land use policies;

g. To provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open space, both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens;

h. To encourage the location and design of transportation routes which will promote the free flow of traffic while discouraging location of such facilities and routes which result in congestion or blight;

i. To promote a desirable visual environment through creative development techniques and good civic design and arrangements;

j. To promote the conservation of historic sites and districts, open space, energy resources and valuable natural resources in the State and to prevent urban sprawl and degradation of the environment through improper use of land;

k. To encourage planned unit developments which incorporate the best features of design and relate the type, design and layout of residential, commercial, industrial and recreational development to the particular site;

l. To encourage senior citizen community housing construction;

m. To encourage coordination of the various public and private procedures and activities shaping land development with a view of lessening the cost of such development and to the more efficient use of land;

n. To promote utilization of renewable energy resources; and

o. To promote the maximum practicable recovery and recycling of recyclable materials from municipal solid waste through the use of planning practices designed to incorporate the State Recycling Plan goals and to complement municipal recycling programs.

It is basic that every zoning ordinance must advance one of those goals. *Damurjian v. Board of Adjustment of Colts Neck*, 299 *N.J.Super.* 84, 93, 690 *A.*2d 655 (App.Div.1997) (citing *Riggs, supra*, 109 *N.J.* at 611, 538 *A.*2d 808 (noting that zoning ordinance must foster at least one of stated purposes of MLUL)).

In determining whether a zoning ordinance is valid, a few basic principles are relevant. Most fundamental is that a zoning ordinance is "insulated from attack" by a presumption of validity. *Riggs, supra*, 109 *N.J.* at 610–11, 538 *A.*2d 808. The party challenging the ordinance bears the burden of overcoming that presumption. *Ward v. Montgomery Township*, 28 *N.J.* 529, 539, 147 *A.*2d 248 (1959). Reviewing courts should not be concerned over the wisdom of an ordinance. If debatable, the

ordinance should be upheld. *Bow & Arrow Manor v. Town of West Orange,* 63 *N.J.* 335, 343, 307 *A.*2d 563 (1973).

Despite that circumscribed role, a court may declare an ordinance invalid if it violates the federal or state constitution, *Riggs, supra,* 109 *N.J.* at 611, 538 *A.*2d 808, or if it is preempted by superior legal authority, *see United Bldg. & Constr. Trades Council v. Mayor & Council of Camden,* 88 *N.J.* 317, 343, 443 *A.*2d 148 (1982) (commenting that when state statute has preempted field by supplying system of law on subject, ordinance dealing with same subject is void), *rev'd on other grounds,* 465 *U.S.* 208, 104 *S.Ct.* 1020, 79 *L.Ed.*2d 249 (1984). Further, "[t]he validity of a land use ordinance or regulation is governed by the MLUL; in sum, it is valid if it serves the purposes of zoning, if it is not arbitrary, and if it meets all of the procedural prerequisites set forth in the statute." William M. Cox, *New Jersey Zoning and Land Use Administration,* § 37–4 at 837 (2003) (Cox, *New Jersey Zoning*).

In assessing the validity of an ordinance, the *ratio decidendi* is provided in the State constitution: the delegation of zoning authority to municipalities "shall be liberally construed" in a municipality's favor. *N.J. Const.* art. 4, § 7, ¶ 11; *see D.L. Real Estate Holdings v. Point Pleasant Beach Planning Bd.,* 176 *N.J.* 126, 132, 820 *A.*2d 1220 (2003) (noting that statutory analysis is informed by constitutional directive that courts give liberal construction to municipal powers expressly conferred by Legislature); *United Bldg., supra,* 88 *N.J.* at 344, 443 *A.*2d 148 (stating that State constitution mandates "liberal construction of legislation in favor of local authority"). That is the backdrop of our inquiry.

## IV

What is at issue in this case is the regulation of the intensity of land use. *See Rumson Estates, supra,* 350 *N.J.Super.* at 331, 795 *A.*2d 290 (indicating that phrase "intensity of land use" refers to size of structures on property). In that connection, *N.J.S.A.* 40:55D–65 provides that:

A zoning ordinance may:

. . . .

b. Regulate the bulk, height, number of stories, orientation, and size of buildings and the other structures; the percentage of lot or development area that may be occupied by structures; lot sizes and dimensions; and for these purposes may specify floor area ratios and other ratios and regulatory techniques governing the intensity of land use and the provision of adequate light and air, including, but not limited to the potential for utilization of renewable energy resources.

Among the definitions set forth in *N.J.S.A.* 40:55D–3 to –7 are several that are in play in that statute. The term "shall" indicates a "mandatory requirement" and the term "may" indicates a "permissive action." *N.J.S.A.* 40:55D–3. "Lot" is "a designated parcel, tract or area of land established by a plat or otherwise, as permitted by law and to be used, developed or built upon as a unit." *N.J.S.A.* 40:55D–4. "Density" is "the permitted number of dwelling units per gross area of land to be developed." *Ibid.* "Floor area ratio" is "the sum of the area of all floors of buildings or structures compared to the total area of the site." *Ibid.* "Building" in turn is defined in *N.J.S.A.* 40:55D–3 as "a combination of materials to form a construction adapted to permanent, temporary, or continuous occupancy and having a roof." "Structure" is "a combination of materials to form a construction for occupancy, use or ornamentation whether installed on, above, or below the surface of a parcel of land." *N.J.S.A.* 40:55D–7. When those definitions are read together, it is clear that floor area ratio under the MLUL expresses a pure mathematical relationship between the size of buildings and the total land area. According to plaintiffs, any variation from that definition is invalid under *Manalapan Builders.* It is that notion that will be tested in this case.

## V

In *Manalapan Builders, supra,* the Appellate Division was faced with an ordinance that specifically included a floor area ratio but provided that the mathematical calculation would be undertaken only after the lot size was reduced by certain specified environmental land features. 256 *N.J.Super.* at 305, 606 *A.*2d 1132.

Among the features excluded from the calculation were rights-of-way; floodways; wetlands; steep slopes; stream corridors; hydric soils; and buffer zones. *Id.* at 298, 606 *A.*2d 1132.

The plaintiffs argued that by subtracting the environmental land features from the property dimensions, prior to calculating floor area ratio, the MLUL definitions of lot and floor area ratio were altered from gross to net units and that the zoning ordinance thus was *ultra vires. Id.* at 299–301, 606 *A.*2d 1132. The municipality countered that those were "other formulas" that it was entitled to enact under *N.J.S.A.* 40:55D–65b to control the intensity of development on environmentally sensitive lands. *Id.* at 305–06, 606 *A.*2d 1132.

The trial court agreed with the plaintiffs as did the Appellate Division. *Id.* at 305, 606 *A.*2d 1132. Without addressing the municipality's "other formulas" argument, the panel focused on the definitions of lot and floor area ratio in the MLUL and held that they were violated by the ordinance. *Id.* at 308, 606 *A.*2d 1132. More particularly, the Appellate Division declared that the MLUL does not "allow municipalities to change the definitions of terms in the statute in order to control development or promote environmental protection." *Id.* at 306, 606 *A.*2d 1132.

In ruling, the court cited *Crow–New Jersey 32 Ltd. P'ship v. Clinton Township,* 718 *F.Supp.* 378 (D.N.J.1989), which had, without much comment, invalidated as inconsistent with the MLUL, an ordinance that calculated permissible floor area ratios only after the size of the lot was reduced to eliminate environmentally sensitive areas. *Manalapan Builders, supra,* 256 *N.J.Super.* at 306–07, 606 *A.*2d 1132. The federal court concluded that the ordinance illegally changed the definition of floor area ratio remarking that "[b]y defining 'floor area ratio' in the ordinance differently than it is defined in the enabling statute, the township has clearly gone beyond its statutory grant of power." *Id.* at 307, 606 *A.*2d 1132 (quoting *Crow–New Jersey, supra,* 718 *F.Supp.* at 388).

We disagree. First, that interpretation receives no support from the language of the MLUL. *N.J.S.A.* 40:55D–3 provides that "[f]or the purposes *of this act,* unless the context clearly indicates a different meaning," certain definitions will apply. (Emphasis added). In other words, when a defined term is used *in the MLUL,* it will have a specified meaning. That is quite different from plaintiffs' suggestion that municipalities are straightjacketed into that definition and are without power to alter it to serve recognized goals of the MLUL. Where statutory language is clear, courts should give it effect unless it is evident that the Legislature did not intend such meaning. *See Turner v. First Union Nat'l Bank,* 162 *N.J.* 75, 84, 740 *A.*2d 1081 (1999) (stating statutory provisions "should be given their literal significance, unless it is clear from the text and purpose of the statute that such meaning was not intended") (citing *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982)).

There is nothing in the legislative history or in the MLUL itself to suggest that the Legislature did not mean exactly what it said or that it intended the definitional language to constitute a broad prohibition on municipal zoning initiatives. Apparently, that is the interpretation municipalities have accorded the statute because variations from an MLUL definition are not at all unusual in zoning ordinances. Cox, *New Jersey Zoning,* § 34–7.5 at 736; *see, e.g., Randolph Town Ctr. Assocs., L.P. v. Township of Randolph,* 324 *N.J.Super.* 412, 415, 735 *A.*2d 1166 (App.Div.1999) (zoning ordinance specifically excluded stairwells, elevator shafts, mechanical and janitor rooms and loading areas in calculating floor area ratio). *See, e.g.,* Allendale, N.J., Code § 33–35; Bernards, N.J., Code § 21–2; Bethlehem, N.J., Code § 102–7; Carteret, N.J., Code § 160–3; Carneys Point, N.J., Code § 212–2; Emerson, N.J., Code § 47–36; Estell Manor, N.J., Code § 10–3b; Haddon, N.J., Code § 230–6; Haddon Heights, N.J., Code § 163–10; Hamilton, N.J., Code § 160–201; Maywood, N.J., Code § 209–25; Pompton Lakes, N.J., Code § 190–4; Rahway, N.J., Code § 195–1; Readington, N.J., Code § 148–1 (stating that MLUL definition applies unless term is defined differently in zoning ordinance).

To be sure, *Manalapan Builders* was not entirely wrong in its approach to the statute. There are obviously some terms in the MLUL that are entitled to primacy. The definition of "interested party" in *N.J.S.A.* 40:55D–4 confers a litigational status on a citizen that could not be limited by an ordinance. Cox, *New Jersey Zoning,* § 34–5.3 at 721. Likewise, if a term used in the MLUL is mandatory, no alteration of it would be permitted. For example, under *N.J.S.A.* 40:55D–66.1, community residences for the developmentally disabled, victims of domestic violence, the terminally ill, persons with head injuries, elderly persons and physically disabled adults "shall be a permitted use in all residential districts of a municipality." Plainly, a town could not exclude or limit such uses in its zoning ordinance.

Turning to this case, if the MLUL had provided that the exclusive method available to a municipality for controlling intensity of residential land use was floor area ratio and had defined that term, both the method and the definition would be binding. In fact, *N.J.S.A.* 40:55D–65b does just the opposite and specifically provides authority for municipalities to use any number of methods to control the intensity of residential use. Included along with floor area ratios are "other ratios and regulatory techniques." Floor area ratio is defined in *N.J.S.A.* 40:55D–4 but other ratios and regulatory techniques are not so defined. The lack of definitions of the latter terms reflects the reality that they encompass a large number of possibilities and that the Legislature intended to empower municipalities to address creatively the subject of the intensity of land use without definitional restriction. There is nothing in the statutory scheme to suggest that the Legislature wished to preclude or otherwise limit the use of other ratios or regulatory techniques either alone or in conjunction with floor area ratio. Indeed, the very notion of "other ratios" seems specifically to encompass a ratio that is *not* simply "the sum of all areas of all floors of buildings or structures compared to the total area of the site." *N.J.S.A.* 40:55D–4.

That is where we think the court in *Manalapan Builders* went astray. Plainly the environmental set-asides in that case did not strictly conform with the MLUL definition of lot to the extent that the total "unit" was reduced by environmental factors. It follows that that reduction altered the floor area ratio which was not based on the "total area" of the site. However, as we have indicated, that did not render the ordinance invalid. As the plaintiffs in *Manalapan Builders* argued, the set-aside was "another formula" authorized by the statute.

Here, in adopting the cap, Fair Haven utilized another regulatory technique in conjunction with floor area ratio. Atlantic Highlands adopted another ratio and applied a slope factor to the total land area. Neither initiative was *ultra vires*.

In sum, a municipality may enact a zoning ordinance that alters the non-mandatory definitions in the MLUL. Likewise, in regulating the intensity of land use, a municipality may adopt not only a floor area ratio based on the relationship between the lot and buildings, but any other ratio or regulatory technique that advances a goal of the MLUL and conforms with the other legal principles to which we have adverted. To the extent that *Manalapan Builders* reached a different conclusion it is disapproved.

## VI

We turn next to plaintiffs' uniformity argument. Two separate uniformity principles inform the MLUL. The first, which is the central and overriding purpose of the statute, is statewide uniformity of process and practices in the areas of zoning and land use. *See Levin, supra*, 82 *N.J.* at 178, 411 *A.*2d 704 (noting that MLUL was enacted in 1976 to reform practices and procedures for land use throughout State); *Accardi v. Mayor and Council of N. Wildwood* 145 *N.J.Super.* 532, 547, 368 *A.*2d 416 (Law Div. 1976) (commenting that primary purpose of MLUL was to uniformly organize municipal agencies throughout State and to establish standards and efficient procedures of land use regulation and planning). That uniformity of process is not at issue in this case.

What is at issue is *N.J.S.A.* 40:55D–62a, which provides in relevant part:

The zoning ordinance shall be drawn with reasonable consideration to the character of each district and its peculiar suitability for particular uses and to encourage the most appropriate use of land. *The regulations in the zoning ordinance shall be uniform throughout each district for each class or kind of buildings or other structures or uses of land,* including planned unit development, planned unit residential development and residential cluster, but the regulations in one district may differ from those in other districts.

[(Emphasis added).]

That statute dates back to our original zoning law, which was enacted in 1928 and was modeled on the Standard State Zoning Enabling Act published by the United States Department of Commerce in 1924. Both Acts contained a uniformity section.

Legal commentators note that there were two sources underpinning the uniformity provision. The first was extra-legal. During the early debates over zoning, "while the subject was in the balance," the assurance to "potentially hostile landowners that all property which was similarly situated would be treated alike" was critical. 1 Robert M. Anderson, *American Law of Zoning,* § 5.22 at 333–34 (2d ed. 1977) (quoting Edward M. Bassett, *Zoning* at 50 (1940)). That uniformity principle essentially gave notice of non-discrimination to property owners. 1 Anderson, *supra,* § 5.22 at 334.

The other basis for the uniformity requirement was, and continues to be, the constitutional guarantees of due process and equal protection that guard against the arbitrary and unreasonable exercise of the police power. *Roselle v. Wright,* 21 *N.J.* 400, 409–10, 122 *A.*2d 506 (1956). As a result, nearly every jurisdiction has incorporated that limit into its zoning law. 1 Anderson, *supra,* § 5.22 at 333.

■ Plaintiffs broadly misinterpret that uniformity principle to mean that there can be no differences in the regulation of property within a zone. More particularly, plaintiffs in *Rumson Estates* contend that because the cap only has an effect on the larger lots in the zone, it renders the ordinance non-uniform. The plaintiffs

in *Ferraro Builders* echo that argument, claiming that Atlantic Highlands lacks the power to provide special rules that apply only to properties in a zone that are on a slope. Not so.

█ In fact, nearly thirty-five years ago, in commenting on an identical uniformity provision in the prior zoning statute, this Court clearly established that uniformity "does not prohibit classifications within a district so long as they are reasonable." *Quinton v. Edison Park Dev. Corp.*, 59 *N.J.* 571, 580, 285 *A.*2d 5 (1971) (interpreting uniformity requirement to allow distinctions among uses within given zone so long as distinctions are not arbitrary and unduly discriminatory); *State v. Gallop Bldg.*, 103 *N.J.Super.* 367, 371, 247 *A.*2d 350 (App.Div.1968) (upholding zoning ordinance providing special buffer zone requirements for property in business zone that border on residential zone).

The same conclusion has been reached by our sister jurisdictions that have had occasion to interpret uniformity language similar to our own. *See, e.g., Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 355 *A.*2d 550, 559 (D.C.) (remarking that uniformity provision does not prohibit classification which is reasonable so long as regulations are applied to all property throughout district with all owners of same class being treated alike), *cert. denied*, 429 *U.S.* 966, 97 *S.Ct.* 396, 50 *L.Ed.*2d 334 (1976); *Montgomery County, Md. v. Woodward & Lothrop, Inc.*, 280 *Md.* 686, 376 *A.*2d 483, 501 (1977) (observing that uniformity requirement does not prohibit classification within district so long as it is reasonable), *cert. denied sub nom., Funger v. Montgomery County, Md.*, 434 *U.S.* 1067, 98 *S.Ct.* 1245, 55 *L.Ed.*2d 769 (1978); *Charter Township of Oshtemo v. Central Adver. Co.*, 125 *Mich.App.* 538, 336 *N.W.*2d 823, 826 (1983) (approving ordinance permitting reasonable restrictions based upon different conditions within zone), *appeal denied*, 426 *Mich.* 871 (1986); *Giger v. City of Omaha*, 232 *Neb.* 676, 442 *N.W.*2d 182, 194 (1989) (uniformity requirement does not prohibit reasonable classifications within district).

In short, plaintiffs are wrong in their crabbed interpretation of *N.J.S.A.* 40:55D–62a. Uniformity is not absolute and rational regulations based on different conditions within a zone are permissible so long as similarly situated property is treated the same. Reasonableness of classification is the key. "Constitutional uniformity and equality requires that classification be founded in real and not feigned differences having to do with the purpose for which the classes are formed." *Roselle, supra,* 21 *N.J.* at 410, 122 *A.*2d 506 (citations omitted).

## VII

Applying the standards to which we have referred, we turn now to the zoning ordinances in question. Like the Appellate Division, we hold that plaintiffs did not overcome the presumption of validity that attached to the ordinances.

## A.

The cap in the Fair Haven ordinance overrides the floor area ratio in situations in which lots are oversized and would otherwise result in the building of huge houses in a zone, which basically is fully established, with much more modest residences. Fair Haven advanced two rationales for the cap. The first was the proportionality of new construction to other houses in the zone and the second, the diversification of housing stock by the building of smaller, more affordable homes. The Appellate Division placed its imprimatur on those goals as do we.

*N.J.S.A.* 40:55D–2(i) specifically underscores the promotion of a desirable visual environment through the use of creative zoning techniques as an end point of the MLUL. That visual component comes into play, where, as here, zoning is enacted after certain areas of a municipality substantially are built up. In such locations, zoning should generally reflect existing conditions. Yet, as commentators have observed,

> [o]ne of the phenomena of the late 20th Century and early 21st Century has been the construction of what have been referred to as 'monster homes', *i.e.,* homes built

to a scale completely out of keeping with the homes in the surrounding area.... These homes, in addition to impinging on the light, air and open space, *N.J.S.A.* 40:55D–2c, of their neighbors particularly in already dense zones also create an adverse visual environment.

[Cox, *New Jersey Zoning,* § 34–7.5 at 735.]

*See also* Paul J. Weinberg, 24 *Zoning & Plan. L. Rep.* 17 (2001) (commenting that " 'monster houses' are . . . failing to match the fabric of the neighborhood" (citations omitted)). It is that disconnection that was a legitimate focus of Fair Haven's disproportionality rationale.

Regarding the diversification of housing stock, Fair Haven maintains that it is attempting to achieve a laudable goal that, in other contexts, we generally have recognized. *See, e.g., Oakwood at Madison, Inc. v. Township of Madison,* 72 *N.J.* 481, 548, 371 *A.*2d 1192 (1977) (adopting notion that general welfare encompasses recognition of local and regional housing needs). Fair Haven underscores the need to build smaller, more affordable houses, observing that many municipal workers cannot afford to live in town. The municipality chose to confront that problem by initiating the cap. Whether that is the most efficient methodology may be debatable. But that is a decision for the municipality rather than for us. *Pierro v. Baxendale,* 20 *N.J.* 17, 26, 118 *A.*2d 401 (1955). Once the decision was made to cap the size of houses in the R–2 zone it became "presumptively valid and . . . [is] not to be nullified except upon an affirmative showing that the action taken . . . was unreasonable, arbitrary or capricious." *Ibid.* We cannot say that that showing was made in this case.

### B.

 Echoing the conclusion of the Appellate Division, we likewise view the points underlying Atlantic Highlands' steep slope ordinance (avoidance of soil erosion and "slump blocking") as legitimate environmental goals of the MLUL. Indeed, "[n]early all of the purposes of the MLUL, which are listed in *N.J.S.A.* 40:55D–2 involve, in some sense or degree, environmental considerations." Cox, *New Jersey Zoning,* § 37–1.1 at 807. In that

connection, *N.J.S.A.* 40:55D–2b also specifically identifies safety from natural and manmade disasters as an aim of the statute. The avoidance of soil erosion with the concomitant diminution of landslides that block ingress and egress to emergency vehicles clearly implicate that goal as well.

 Ferraro argues that the steep slope ordinance is an invalid singling out of its property because it will not effectively address soil erosion and slump blocking insofar as some portion of the slopes can still be built upon. No doubt, reasonable minds could differ regarding the effectiveness of the steep slope ordinance. But "[a] mere difference of opinion as to how an ordinance will work will not lead to a conclusion of invalidity; 'no discernible reason' is the requisite standard." *Zilinsky v. Zoning Bd. of Adjustment of Verona*, 105 *N.J.* 363, 369, 521 *A*.2d 841 (1987) (citing *Roselle*, *supra*, 21 *N.J.* at 410, 122 *A*.2d 506). The officials of Atlantic Highlands have determined that by limiting the amount of land disturbance on the slopes it will lessen *to some extent* the amount of soil erosion and decrease the chances of slump blocking. Plaintiffs have failed to show that that judgment is wholly lacking a reasonable basis.

It seems to us, as it did to the Appellate Division that the reasons advanced by Fair Haven and Atlantic Highlands for the classifications within the zones are real and not feigned and that they advance and are reasonably related to the purposes of zoning. *Sartoga v. Borough of W. Paterson*, 346 *N.J.Super.* 569, 579, 788 *A*.2d 841 (App.Div.), *certif. denied*, 172 *N.J.* 357, 798 *A*.2d 1270 (2002). That is not to suggest that we have determined that the zoning initiatives at issue are the "best" classifications to achieve the stated purposes or that they will, in fact, do so. That is not our mission. Rather, we declare them to be rational approaches to discernible problems and conclude that plaintiffs have failed to prove the contrary.

## VIII

The judgments of the Appellate Division are affirmed.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—7.

*Opposed*—None.